**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| DENNIS BECKER, JEAN CONEY, GABRIELLE WRIGLEY, and VICKI LAQUIDARA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NISSAN OF NORTH AMERICA, INC., and NISSAN MOTOR CO., LTD.,<br><br>Defendants. | Case No. _<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Dennis Becker, Jean Coney, Gabrielle Wrigley, and Vicki Laquidara ("Plaintiffs"), by and through their attorneys, bring this action against Nissan of North America, Inc. ("NNA") and Nissan Motor Co., Ltd. ("NMC") (collectively, "Defendants" or "Nissan"), individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this consumer class action lawsuit individually, and on behalf of all similarly situated persons ("Class Members"), who purchased or leased vehicles, including 2021-2023 Nissan Rogue, 2019-2023 Nissan Altima, and 2019-2023 Infiniti QX50 vehicles, equipped with KR15DDT and KR20DDET engines ("Class Vehicles") designed, manufactured, and distributed NMC and manufactured, distributed, marketed, sold and warranted by NNA.

2.      Unbeknownst to Plaintiffs and other consumers when they purchased or leased their Class Vehicles, the Class Vehicles suffer from latent design, workmanship, and/or manufacturing defects in the variable compression system, which regulates the piston strokes in the Class Vehicles' engines and affects the ability of the vehicles to provide power (the "Engine Defect").

Discovery will show that the Engine Defect results from, among other things, malfunctions in the main bearings and/or lower-link ("L-Link") seizures.

3.      The variable compression system is unique to Nissan-brand VC-Turbo engines, like the engines in Class Vehicles, and is supposed to produce higher power and provide better fuel efficiency than engines with typical compression systems.

4.      NMC is the first manufacturer of a mass-produced variable compression engine. Per NMC, the engines in Class Vehicles are the result of decades of careful research and study, beginning in 1998.[1]  Despite this care, the engines in Class Vehicles are plagued with the Engine Defect which causes knocking or high-pitched whirring noises, hesitation, rough idling, stalling, loss of power, and sudden engine failure while the vehicle is in motion (both with and without the check engine light illuminating), increasing the changes of collision significantly.

5.      The Engine Defect has been documented to occur without warning, with Class Members taken by surprise when the engines in the Class Vehicles suddenly lose power or stop completely. Even if no collision results, Plaintiffs and Class Members incur thousands in out-of-pocket costs to repair or replace the damaged engine and/or engine components.

6.      Discovery will show that Defendants knew or should have known that, as of 2019, the Class Vehicles were defective and possessed a substantial risk of failure while being driven such that they were not fit for their intended purpose of providing safe and reliable transportation at the time of sale and thereafter. Defendants have actively concealed the true nature and extent of the Engine Defect from Plaintiffs and other Class Members, and failed to disclose it to them at the time of purchase or lease and thereafter. Had Plaintiffs and prospective Class Members known about the Engine Defect, they would not have purchased the Class Vehicles or would have paid less for them.

---

[1] https://www.nissan-global.com/EN/INNOVATION/TECHNOLOGY/ARCHIVE/VC_TURBO_ENGINE/#:~:text=The%20rotation%20of%20the%20control,cylinder%2C%20changing%20the%20compression%20ratio.

7.      The engines in Class Vehicles are substantially similar in their use of an identical or nearly identical variable compression system, with identical parts. As such, the Engine Defect is identical or substantially similar, as well as inherent, in each Class Vehicle.

8.      Defendants' knowledge of the Engine Defect comes from, among other things, pre-production testing, numerous consumer complaints, warranty data, dealership repair orders, and internal analyses of complaint and production issues. Despite this knowledge, Defendants have not recalled the Class Vehicles, nor offered suitable repair or replacement free of charge, nor offered to reimburse all Class Vehicles owners and leaseholders the costs they incurred relating to diagnosing and repairing the Engine Defect.

9.      Despite knowing of the Engine Defect, Defendants regularly deny its existence until after the expiration of the five-year/60,0000 the Nissan New Vehicle Limited Warranty Powertrain Coverage ("Nissan Warranty") or the six-year/70,000 miles Infiniti New Vehicle Limited Warranty Powertrain Coverage ("Infiniti Warranty"), or otherwise require payments for repairs, diagnostics, or alternative transportation even while the Class Vehicles are under warranty.

10.      Defendants knew of and concealed the Engine Defect contained and inherent in every Class Vehicle, along with the attendant dangerous safety problems and associated repairs from Plaintiffs and other putative Class members, at the time of sale or lease and thereafter. As a result of their reliance on Defendants' misstatements about the quality, reliability, and durability of the Class Vehicle's engines, how inclusion of the variable compression system enhanced the value of the Class Vehicles, and how NNA would honor its express warranty and provide repairs for known defects, as well as Defendants' omissions regarding the existence, extent, associated safety risks, and costs associated with the Engine Defect, owners and lessees of the Class Vehicles have suffered an ascertainable loss of money, property, and/or loss of value of their Class Vehicles, and have not  received the benefit of their bargains.

## JURISDICTION AND VENUE

11.     This is a class action.  As such, this Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").

12.     The aggregated claims of the individual class members exceed the sum value of $5,000,000, exclusive of interests and costs.  This court also has federal question jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims under the Magnuson-Moss Act arise under federal law and the Court may exercise supplemental jurisdiction over the rest of their claims.

13.     This Court has personal jurisdiction over NNA because it is incorporated in Delaware and NNA has consented to jurisdiction by registering to conduct business in the state. This Court has personal jurisdiction over NMC because it avails itself of the ports of Delaware in Wilmington to deliver products to the United States. Defendants' otherwise have sufficient minimum contacts with Delaware, and/or otherwise intentionally avail themselves of the markets within Delaware, through the promotion, sale, marketing and distribution of their vehicles in Delaware, so as to render the exercise of jurisdiction by this Court proper and necessary.

14.     Venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within the District of Delaware. Plaintiffs may properly sue NNA in this District, its state of incorporation.

## PARTIES

### Plaintiff Dennis Becker

15.     Plaintiff Becker is a citizen and resident of Florida.

16.     On or around March 30, 2024, Plaintiff Becker purchased a new 2023 Nissan Rogue from Harbor Nissan, an authorized Nissan dealership located in Charlotte, Florida.

17.     Plaintiff Becker purchased his vehicle primarily for personal, family, or household use.

18.     Safety and reliability were important factors in Plaintiff Becker's decision to purchase his vehicle. Plaintiff Becker reviewed the Maroney label on the vehicle, researched and compared vehicles online, and discussed the vehicle with an authorized dealership representative. Relying on these representations, Plaintiff Becker believed that the vehicle would be a safe and reliable vehicle and that NNA would fix any defects with the vehicle per the terms of the warranties it provided. When Plaintiff Becker purchased his vehicle, he was unaware that the vehicle contained the Engine Defect.

19.     Plaintiff Becker was never informed by Defendants that his vehicle suffered from the Engine Defect. Defendants' omissions were material to Plaintiff Becker. Had Defendants disclosed their knowledge of the Engine Defect before he purchased his vehicle, Plaintiff Becker would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Becker would not have purchased his vehicle or would not have purchased his vehicle for the price he did.

20.     On or around April 4, 2024, with approximately 157 miles on the odometer, Plaintiff Becker began to experience the Engine Defect.  The vehicle's dashboard warning light illuminated stating "Engine Malfunction Power Reduced Service Now," and the vehicle lost power, coasted to a stop, and would not re-start. As a result, on the same day, Plaintiff Becker had his vehicle returned to Harbor Nissan. The technician replaced the battery.

21.     The battery replacement did not repair Plaintiff Becker's vehicle.

22.     On or around April 9, 2024, Plaintiff Becker again returned his vehicle to Harbor Nissan. Once again, the check engine light illuminated on the dashboard and the vehicle lost power while being driven. The technician re-programmed the Engine Control Module with the latest software update.

23.     The software update did not repair Plaintiff Becker's vehicle.

24.     On or around May 8, 2024, while being driven, the vehicle's dashboard warning light illuminated stating "Engine Malfunction Power Reduced Service Now," the vehicle lost power, and coasted to a stop once more. Plaintiff Becker returned his vehicle to Harbor Nissan.

The technician verified Plaintiff Becker's concerns and replaced the exhaust gas recirculation valve and gasket.

25.     The replacement of the exhaust gas recirculation valve and gasket did not repair Plaintiff Becker's vehicle.

26.     To date, Plaintiff Becker's vehicle has not been permanently repaired and continues to be defective.

27.     As a result of the Engine Defect, Plaintiff Becker has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Becker will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

28.     At all times, Plaintiff Becker, like all class members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used. At all times, he has maintained her vehicle according to the maintenance and service guidelines of NNA.

**Plaintiff Jean Coney**

29.     Plaintiff Jean Coney is a citizen and resident of New York.

30.     In or around February 8, 2022, Plaintiff Coney purchased a certified pre-owed 2019 Infiniti QX50 from Pepe Infiniti, Inc., an authorized Infiniti dealership located in White Plains, New York. At the time, the vehicle had 25,930 miles on the odometer.

31.     In addition to the certified pre-owned warranty, and the remainder of the Infiniti warranty, Plaintiff Coney also purchased an additional Certified Pre-Owned Wrap Warranty offered by Infiniti.  This warranty extended the warranty coverages to 8 years, with unlimited mileage, from the original Infiniti Warranty start date of October 18, 2018. This additional coverage costs $2,162. As a result, the Infiniti Warranty guarantees were extended to October 18, 2026.

32.     Plaintiff Coney purchased her vehicle primarily for personal, family, or household use.

33.     Safety and reliability were important factors in Plaintiff Coney's decision to purchase her vehicle. Plaintiff Coney reviewed the vehicle's Monroney window sticker, the vehicle's CarFax, went to the manufacturer's website to review vehicle features, the certified-pre-owned inspection paperwork, the extended warranty paperwork, and discussed the vehicle with an authorized dealership representative. Relying on these representations, Plaintiff Coney believed that the vehicle would be a safe and reliable vehicle and that NNA would fix any defects with the vehicle per the terms of the warranties it provided. When Plaintiff Coney purchased her vehicle, she was unaware that the vehicle contained the Engine Defect.

34.     Plaintiff Coney was never informed by Defendants that her vehicle suffered from the Engine Defect. Defendants' omissions were material to Plaintiff Coney. Had Defendants disclosed their knowledge of the Engine Defect before she purchased her vehicle, Plaintiff Coney would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Coney would not have purchased her vehicle.

35.     Immediately after purchasing the vehicle, Plaintiff Coney began to experience the Engine Defect. In particular, she noticed unusual noises coming from the engine compartment.  It was a high-pitched whirring sound during idle, acceleration, braking and turning. On or about April 1, 2022, she made an appointment with Pepe Infiniti to diagnose her vehicle. The appointment was scheduled for April 26, 2022.

36.     At the April 26, 2022 appointment, Plaintiff Coney was told that there was nothing wrong with her vehicle, that there were no abnormal noises, and that the vehicle was functioning as designed.

37.     Plaintiff Coney continued to experience strange noises coming from the engine compartment during idle and when she attempted to accelerate, as well a lack of acceleration and power when she pressed on the gas pedal.

38.     On or about June 24, 2024, Plaintiff Coney took her vehicle to Infiniti of White Plains, an authorized Infiniti dealership located in White Plains, New York. She complained about the continuing issues with her engine.  The technician at the dealership verified her concerns, finding "internal engine failure causing excessive noise", specifically a lack of oil pressure and engine bearing failure. An inspector from NNA came out to verify the issues and authorized a complete engine replacement.  Due to the number of parts that had to be ordered and replaced, as well as the demand for such replacement parts, the engine replacement was not completed until on or around August 30, 2024.

39.     This engine replacement did not repair Plaintiff Coney's vehicle.

40.     On or about January 2, 2025, Plaintiff Coney experienced complete engine failures in her vehicle while she was driving on the Taconic Parkway. The car sputtered, then died as she pulled into a nearby parking lot. The vehicle was towed to Infiniti of White Plains. On or about January 15, 2025, Plaintiff Coney was told over text "defective engine provided to us from Infiniti."  She received her vehicle back with a second new engine in February 2025.

41.     This second engine replacement did not repair Plaintiff Coney's vehicle.

42.     On or about June 6, 2025, Plaintiff Coney was driving her vehicle when the engine began to make loud noises and suddenly failed, causing her vehicle to lose power and to become a road hazard. She called for a tow truck driver, who observed that there was engine oil and steam coming from the engine and that the "engine was shot."  Plaintiff Coney had the vehicle towed to Infiniti of White Plains for diagnosis.

43.     On or about June 10, 2025, Plaintiff Coney was informed by the dealership they were beginning their examination and diagnosis of the vehicle. The next day, she was informed that the engine had failed again and another engine would be ordered for her vehicle.  When she asked about the specific issue, she was informed via text by Alex, the service manager at the dealership, that the engine had a manufacturing defect. He explained that "the flywheel on the back came loose because a pin that should have been installed by the factory either was not there or came and rubbed against the engine making the oil leak."

44.    The dealership replaced the engine in her vehicle with another new engine. This third engine replacement did not repair Plaintiff Coney's vehicle.

45.    On or about July 5, 2025, Plaintiff Coney's son was driving the vehicle locally when he noticed the engine bucking. On July 6, 2025, Plaintiff Coney's son had driven the car around the block when the engine began to buck and then lose power. As the vehicle rapidly decelerated, he pulled the vehicle into an empty parking lot where the engine died. When Plaintiff Coney arrived, she attempted to restart the vehicle but the engine only sputtered and filled the air with the smell of burning oil.

46.    The vehicle was delivered to Infiniti of White Plains, which diagnosed the vehicle as having an air pocket in the gas line. The dealership claims that the air pocket was the result of the prior repair attempt. However, Plaintiff Coney is unsure that diagnosis is correct as the symptoms of the current failure are the same as the previous failures.

47.    To date, Plaintiff Coney's vehicle has not been permanently repaired and continues to be defective.

48.    As a result of the Engine Defect, Plaintiff Coney has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. As a result, she has purchased a new vehicle and no longer intends to drive her Class Vehicle. Further, Plaintiff Coney will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

49.    At all times, Plaintiff Coney, like all class members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used. At all times, she has maintained her vehicle according to the maintenance and service guidelines of NNA.

**Plaintiff Gabrielle Wrigley**

50.    Plaintiff Wrigley is a citizen and resident of Illinois.

51.     On or around July 21, 2021, Plaintiff Wrigley purchased a new 2019 Nissan Altima from Bommarito Nissan Ballwin, an authorized Nissan dealership located in Ballwin, Missouri.

52.     Plaintiff Wrigley purchased her vehicle primarily for personal, family, or household use.

53.     Safety and reliability were important factors in Plaintiff Wrigley's decision to purchase her vehicle. Plaintiff Wrigley discussed the vehicle's engine and power with an authorized dealership representative because she owned an earlier model Nissan Rogue that exhibited engine issues. Relying on these representations, Plaintiff Wrigley believed that the vehicle would be a safe and reliable vehicle and that NNA would fix any defects with the vehicle per the terms of the warranties it provided. When Plaintiff Wrigley purchased her vehicle, she was unaware that the vehicle contained the Engine Defect.

54.     Plaintiff Wrigley was never informed by Defendants that her vehicle suffered from the Engine Defect. Defendants' omissions were material to Plaintiff Wrigley. Had Defendants disclosed their knowledge of the Engine Defect before she purchased her vehicle, Plaintiff Wrigley would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Wrigley would not have purchased her vehicle or would not have purchased her vehicle for the price she did.

55.     In or around December 2023, Plaintiff Wrigley began to experience the Engine Defect. The vehicle had jerked while driving. As a result, Plaintiff Wrigley delivered her vehicle to Dream Nissan Midwest, an authorized Nissan dealership located in Wood River, Illinois. The technician told Plaintiff Wrigley that the vehicle was operating normally and did not perform repairs.

56.     To date, Plaintiff Wrigley's vehicle has not been permanently repaired and continues to be defective.

57.     As a result of the Engine Defect, Plaintiff Wrigley has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Wrigley will be unable to rely on the Class Vehicles' advertising or

labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

58.     At all times, Plaintiff Wrigley, like all class members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used. At all times, she has maintained her vehicle according to the maintenance and service guidelines of NNA.

**Plaintiff Vicki Laquidara (NY)**

59.     Plaintiff Laquidara is a citizen and resident of New York.

60.     On or around January 4, 2021, Plaintiff Laquidara purchased a new 2021 Nissan Altima from Nissan 112, an authorized Nissan dealership located in Patchogue, New York.

61.     Plaintiff Laquidara purchased her vehicle primarily for personal, family, or household use.

62.     Safety and reliability were important factors in Plaintiff Laquidara's decision to purchase her vehicle. Plaintiff Laquidara discussed the vehicle with an authorized dealership representative who recommended the vehicle to her. Relying on these representations, Plaintiff Laquidara believed that the vehicle would be a safe and reliable vehicle and that NNA would fix any defects with the vehicle per the terms of the warranties it provided. When Plaintiff Laquidara purchased her vehicle, she was unaware that the vehicle contained the Engine Defect.

63.     Plaintiff Laquidara was never informed by Defendants that her vehicle suffered from the Engine Defect. Defendants' omissions were material to Plaintiff Laquidara. Had Defendants disclosed their knowledge of the Engine Defect before she purchased her vehicle, Plaintiff Laquidara would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Laquidara would not have purchased her vehicle or would not have purchased her vehicle for the price she did.

64.     On or around November 2021, with approximately 3,000 miles on her vehicle, Plaintiff Laquidara began experiencing the Engine Defect. The vehicle jerks while driving and the engine light remains illuminated. As a result, Plaintiff Laquidara delivered her vehicles to Nissan 112, an authorized Nissan dealership in Patchogue, New York. The technicians worked on the

vehicle for several hours. When the vehicle was returned to Plaintiff Laquidara's possession the engine light was still illuminated. Plaintiff needed a vehicle so she had no choice but to take the vehicle until a rental car was available.

65.    About a week later, the Nissan dealership informed Plaintiff Laquidara that they had a rental vehicle available. Plaintiff Laquidara took her vehicle to Nissan 112 for a second time where the technicians kept the vehicle for several months. At first, the technicians informed Plaintiff Laquidara that multiple parts would need to be replaced on the vehicle. The dealership later determined that the engine would need to be replaced. Ultimately, the engine was replaced with an equally defective, but new engine. She received her vehicle back in or around the end of January 2022.

66.    This engine replacement did not repair Plaintiff Laquidara's vehicle.

67.    To date, Plaintiff Laquidara's vehicle has not been permanently repaired and continues to be defective.

68.    As a result of the Engine Defect, Plaintiff Laquidara has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Laquidara will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

69.    At all times, Plaintiff Laquidara, like all class members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used. At all times, she has maintained her vehicle according to the maintenance and service guidelines of NNA.

**<u>Defendants</u>**

70.    Defendant Nissan North America, Inc. ("NNA") is a Delaware corporation with its headquarters and principal place of business located at One Nissan Way, Franklin, Tennessee 37067 and doing business in Tennessee and throughout the United States.  At this facility, NNA coordinates the United States operations and activities of the Nissan and Infiniti-brands. Infiniti is

a brand and a division of NNA and NMC, but is not a separate entity. One of NNA's fictitious names is Infiniti of North America, Inc.

71.   Defendant NNA, through its various entities, markets, distributes, warrants, and sells Nissan and Infiniti-branded automobiles and parts for those automobiles, including the Class Vehicles, in multiple locations across the United States including New York. NNA maintains many operational facilities throughout the United States to effectively design, test, distribute, warrant and sell Nissan and Infiniti-branded vehicles. NNA maintains the Nissan Technical Center in Farmington Hills, Michigan, which performs research and development, engineering and testing of Nissan and Infiniti-branded vehicles, as well as the Nissan Advanced Technology Center Silicon Valley in Santa Clara, California, which develops advanced vehicle technology. NNA maintains a vehicle design facility in San Diego, California, and two separate finance companies to loan money to customers to finance Nissan and Infiniti-branded vehicles, including Nissan Motor Acceptance Company LLC with offices in both in NNA's headquarters and in Irving, Texas. NNA also oversees the United States manufacturing of Nissan and Infiniti-branded vehicles, at manufacturing plants in Smyrna (which produces both Nissan and Infiniti vehicles), Tennessee, Decherd, Tennessee (which produces engines, as well as forgings and castings), and Canton, Mississippi (which produces certain Nissan vehicles).

72.   In order to sell vehicles to the general public, NNA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Nissan branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties NNA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to NNA and NMC instructions, issued through service manuals, TSBs, and other documents. Per the agreements between NNA and the authorized dealers, consumers such as Plaintiffs are able to receive services under NNA's issued warranty at dealer locations that are convenient to them, making Plaintiffs and consumers the third-party beneficiary

of these contracts. These agreements provide NNA with a significant amount of control over the actions of the authorized dealerships, of which there are nearly hundreds in the United States.

73.     NNA, in conjunction with NMC, drafted the warranties it provides directly to consumers such as Plaintiffs. These warranties are provided on a take-it-or-leave-it basis and give NNA the sole power in determining whether a repair is coverable by the warranty. NNA designated its authorized dealerships as its agents to perform warranty repairs.

74.     NNA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. NNA is also responsible for the content of the Monroney Stickers on Nissan and Infiniti-branded vehicles, the information for which comes from the manufacturer, NMC and NNA. NNA further is the designated agent of NMC in fulfilling the manufacturers' reporting, recall, and other duties under federal motor vehicle safety laws and in interfacing with NHTSA.

75.     Founded in 1933 and headquartered in Yokohama, Japan, Defendant Nissan Motor Co., Ltd. is a corporation organized under the laws of Japan. NMC designs, tests, manufactures and distributes automobiles and related parts, and also oversees world-wide operations for the Nissan and Infiniti brands.  NMC delivers a comprehensive range of products under various brands that are manufactured in Japan, the United States, Mexico, the United Kingdom and other countries.  NMC is the parent and 100% owner of NNA and chose to incorporate NNA in Delaware, to avail both entities of Delaware law.

76.     NMC maintains various facilities throughout the world, including in China, Hong Kong, Taiwan, Brunei, the Philippines, India, Thailand, Myanmar, France, Belgium and Spain, among other countries.  NMC also maintains including multiple vehicle and parts manufacturing facilities throughout Japan, including the Nissan Motor Corporation Research Center, the Nissan Advanced Technology Center, Nissan Technical Center, the Global Design Center, and the Nissan Global Information System Center which is responsible for strategic planning, development and operation of NNA and NMC's proprietary software systems, including for disseminating technical information to authorized dealerships. NMC also runs four proving grounds in Japan where Nissan

14

and Infiniti vehicles are put through vigorous testing and evaluation, including crash tests, durability testing, and powertrain testing. Discovery will show that the engines in Class Vehicles were largely designed and tested in Japan, specifically at the Tsurumi Office which is responsible for powertrain testing.

77.     At all relevant times, NNA and NMC were engaged in the business of designing, manufacturing, marketing, distributing, and selling automobiles, including but not limited to the Class Vehicles, and other motor vehicles and motor vehicle components, in Tennessee and throughout the United States. NNA and NMC collaborate on marketing efforts in the United States, as well as training dealership technicians. NNA is solely responsible for the warranties distributed in North America.

78.     NNA and NMC collaborate in providing all the technical information for the purpose of servicing and repairing the Class Vehicles, as well as the information needed to draft the owners' manual. While NMC runs the Nissan Education center, which includes the Nissan Learning Center (responsible for implementing technology and skills training for affiliated companies) and the Nissan Automobile Technical College (responsible for training automotive technicians), NMC works with NNA to provide all the training necessary for technicians to work at NNA-authorized dealerships.

79.     Whenever, in this Complaint, reference is made to any act, deed or conduct of Defendants, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants.

## FACTUAL ALLEGATIONS

80.     For years, NMC has designed, tested, manufactured, distributed, sold and marketed the Class Vehicles and replacement parts for the Class Vehicles. NNA has marketed, distributed,

sold and warranted the Class Vehicles nationwide, through its network of authorized dealerships and service providers.

## I.    The Defect

81.    The most common engine on the road is the internal combustion engine ("ICE"). In ICEs, both ignition and combustion occur within the engine. These engines take gas, mix it with air, and then ignite the mixture to produce an explosion in a sealed chamber that only allows for the force created to exit in one way, pushing the crankshaft and providing power to the flywheel, which in turn provides motive power to the wheel through the driveshaft.

82.    Most ICEs have a four-stroke cycle, which refers to the movement of the pistons up and down in the cylinders of the combustion chamber. The four strokes are: Intake, Compression, Power/Working Stroke, and Exhaust. Figure 1 below illustrates these four strokes.



**FIGURE 1**

83.    During Intake, the head of the piston moves downward, from the top dead center (TDC) of the combustion chamber to bottom dead center (BDC) to make room for the incoming air-fuel mixture. At this time, the intake valve is open, the exhaust valve is closed.

84.    During Compression, the head of the piston moves upward, from BDC to TDC to compress the air fuel mixture, which increases the temperature of the air-fuel mixture so that it is easier to ignite.  At this time, both the intake and exhaust valves are closed.

85.    The Power stroke occurs immediately after combustion of the air-fuel mixture by the spark plug, in the case of engines in Class Vehicles. The resultant explosion pushes the piston from TDC to BDC. In so doing, the force of the explosion is transferred from the piston, through the connecting rod, to the crankshaft and flywheel, which distributes the power to the wheels. In order to force the power created downward, both the intake and exhaust valves remain closed.

86.    Finally, during Exhaust stroke, the exhaust valve opens and the piston moves from BDC to TDC, pushing out the exhaust gases.  Then the four-stroke cycle begins once more.

87.    For most ICEs, there is a fixed compression ratio, which is the ratio of the volume of the cylinder when the piston is at BDC to the volume of the cylinder when it is at TDC. A cylinder has the greatest volume available at BDC and least volume available at TDC. The higher the ratio, the more power an engine can produce (i.e. it extracts more energy from the combustion because less fuel is needed to produce the same combustion), but if the ratio is too high, early combustion occurs because the air-fuel mixture is too hot.[2] At that point, the engine starts making noises, including knocking noises, and internal engine components become damaged.

88.    A typical ICE has a fixed compression ratio of between 8:1 and 12:1. The engines in Class Vehicles, however, are variable compression engines, meaning the compression ratio changes between 8:1, in a high load condition (i.e. more power needed to move or maintain speed, for example when towing or climbing a hill), to 14:1 (i.e. less power needed to move or maintain speed, for example when cruising at highway speeds), in a low load condition.

89.    As explained by Defendants, the KR15DDT and KR20DDET engines, otherwise known as VC-Turbo engines, in Class Vehicles "uses a multi-link system in place a traditional

_____

[2] Air-fuel mixtures can be ignited either by introducing an ignition source, like a spark plug, or if they are compressed enough to lower the ignition point to the temperature of the engine. If a compression ratio is too high, the mixture will ignite too early, damaging engine components.

connecting rod to rotate the crankshaft, and actuator motor changes the multi-link system endpoint to vary the pistons' reach to transform the compression ratio…The optimal compression ratio can be continuously set to match the operation of the accelerator pedal by the driver."

90.    Figure 2 below is provided by Defendants to illustrate the hardware differences between a conventional ICE and one of the engines in Class Vehicles.



**FIGURE 2**

91.    As can be seen, there are significantly more pieces of hardware in the VC Turbo engines than in a conventional engine. As described by Nissan, this system works as follows: 1) when it a change in compression ratio is needed as determined by the Engine Control Module ("ECM"), the actuator motor moves the actuator arm; 2) the arm then rotates the control shaft; 3) the rotation of the control shaft moves the L-link, which changes the link-system angle; and 4) the system then adjusts the vertical position of the piston stroke.  *See* Figure 3.



**FIGURE 3**

92.    The purpose of this new design was to increase engine efficiency, by changing the power output as needed to driver commands, and increase fuel efficiency. As stated by Nissan:

> Research for VC-Turbo was started in 1998. Several methods were utilized to realize the VC-Turbo. Developing a variable compression system using a link mechanism, optimizing the link layout, using advanced analysis to produce precision part shapes, and creating a new high-precision heat treatment were just a few technological hurdles. As a result, Nissan became the world's first auto manufacturer to start mass production of a variable compression engine.[3]

93.    All of these new, additional parts require both movement and lubrication in order to decrease friction. The movement of these pieces comes from the inclusion of bearings in the various links. Where the conventional engine depicted by Nissan in Figure 2 has bearings at both the top and bottom of the bearing rod, the VC turbo engine has bearings at nine different places. Moreover, in order to move well and not generate excess heat, all of these bearings require lubrication.

---

[3] https://www.nissan-global.com/EN/INNOVATION/TECHNOLOGY/ARCHIVE/VC_TURBO_ENGINE/#:~:text=The%20rotation%20of%20the%20control,cylinder%2C%20changing%20the%20compression%20ratio.

94.     Further, the variable compression system is the first of its kind in mass production. Unlike many other component pieces of engines, the pieces involved in the variable compression system are brand new, and as such, the suppliers of any of the pieces did not have the kind of expertise and knowledge that comes from having made hundreds of thousands or millions of pieces beforehand. Similarly, Defendants' employees putting together these engines did not have the experience and expertise of assembling such complicated systems, making them far more likely to misassemble the engines in Class Vehicles.

95.     As a result, the variable compression system in the engines in Class Vehicles suffers from design, manufacturing, and workmanship defects, including, but not limited to: 1) bearing failures in the various links, as the various bearings within the design are unable to withstand the heat and pressure of the system and degrade; 2) design defects of the software in the ECM which control the actuator arm, causing the various compression system to activate incorrectly or at the wrong time; 3) workmanship defects in assembly; and/or 4) use of substandard materials and workmanship in the production, inspection and installation of the U-Link, L-Link, and C-Link of the variable compression system.

96.     As a result of the Engine Defect, the Class Vehicles exhibit the following symptoms: strange noises from the engine, including knocking and high-pitched whirring sounds, sometimes described as if a loud fan is blowing; loss of power while being driven; excessive oil consumption; hesitation or lack of acceleration when the drivers steps on the gas pedal; and engine failure while being driven.

## II.    The Warranty

97.     NNA provided all purchasers and lessees of the Class Vehicles with either the Nissan Warranty or the Infiniti Warranty with the purchase or lease of the Class Vehicles.

98.     The Nissan Warranty provides Powertrain Coverage for 60 months or 60,000 miles, whichever comes first and "covers any repairs needed to correct defects in material or workmanship" for the Engine, Transmission and Transaxle, Drivetrain, and Restraint System

supplied by Nissan.  The components covered for the Engine include "cylinder heads and block and all internal parts, rocker covers and oil pan, valve train and front cover, timing change and tensioner, oil pump, water pump, and fuel pump, fuel injectors, intake and exhaust manifolds, flywheel, seals and gaskets."

99.    The Infiniti Warranty provides Powertrain Coverage for 72 months or 70,000 miles, whichever comes first and "covers any repairs needed to correct defects in material or workmanship" for the Engine, Transmission and Transaxle, Drivetrain, and Restraint System supplied by Infiniti.  The components covered for the Engine include "cylinder heads and block and all internal parts, rocker covers and oil pan, valve train and front cover, timing change and tensioner, oil pump, water pump, and fuel pump, fuel injectors, intake and exhaust manifolds, flywheel, seals and gaskets."

100.    The Nissan Warranty and Infiniti Warranty also includes Towing Coverage under the following terms: "If your vehicle is inoperative due to the failure of a warranty part during any of the New Vehicle Limited warranties, including Emission and Seatbelt warranties, towing service to the nearest authorized Infiniti retailer is covered."

101.    The Nissan Certified Pre-Owned Warranty ("Nissan CPO Warranty") provides coverage from 7-years or 100,000 miles, whichever comes first, for covered parts including the Engine.  The Engine includes "cylinder heads and black and all internally lubricated parts, rocker covers and oil pan, valvetrain, crankshaft pulley and front cover, timing chain and tensioner, oil pump and fuel pump, fuel injectors, intake and exhaust manifolds and turbochargers, flywheel, seals, and gaskets."

102.    Similarly, the Infiniti Certified Pre-Owned Warranty ("Infiniti CPO Warranty") offers coverage for five years or 60,000 miles, whichever comes first, for covered parts including the Engine. The Engine includes "cylinder heads and black and all internally lubricated parts, rocker covers and oil pan, valvetrain, crankshaft pulley and front cover, timing chain and tensioner,

oil pump and fuel pump, fuel injectors, intake and exhaust manifolds and turbochargers, flywheel, seals, and gaskets."

103.    These warranties are provided to Plaintiffs and members of the Class by NNA directly.  They are transferable with the vehicles, meaning subsequent buyers are covered by the terms of the warranties so long as the duration of the warranties has not expired. The terms of these warranties are non-negotiable and NNA reserves the right to pay for repairs under the terms of these warranties at its own discretion.

104.    The warranties and representations contained therein were and are material to Plaintiffs and members of the Class because Plaintiffs and members of the Class would not have purchased or leased their vehicles, or would not have paid as much as they did if they had known that NNA would be unable or unwilling to repair a serious defect like the Engine Defect.

## III.    Defendants' Advertising Emphasizes Safety and Reliability But Fails to Disclose the Defect

105.    Defendants' advertisements about the Class Vehicles, and particularly the VC-Turbo engines, emphasizes innovation, quality, safety and reliability. In particular, the advertising of Defendants depicted that the same engineering that gave them the VC-Turbo engine also gave them safety technology to make the vehicles safer.

106.    Despite these representations, the Engine Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous.  No mention of the Engine Defect or its associated safety risks was ever made.

107.    For example, the brochure for the 2019 Infiniti QX50 touts both the efficiency of the engine and the safety of the vehicle:

**REFUSE TO COMPROMISE** The biggest revolution in the internal combustion engine since its inception, the INFINITI VC-Turbo™ is the world's first production-ready engine that continuously transforms to optimize both power and efficiency. The multi-link system flexes to lower the compression ratio when more power is needed and relaxes to raise the compression ratio when greater fuel efficiency[2] is desired.

**EXTEND YOUR AWARENESS** Heighten your abilities with leading safety technologies. For example, Predictive Forward Collision Warning,[5] an INFINITI world's first technology, monitors not only the vehicle directly in front of you but also the vehicle in front of that one, to help warn you of sudden deceleration.

108.    These representations are repeated throughout the model years of Class Vehicles, but none of them mention the existence of the Engine Defect or its associated safety risks.

**2020 Infiniti QX50**



**⌄ POWER OR EFFICIENCY? YES.**
The INFINITI VC-Turbo™ is the first production variable compression turbo to continually transform for optimal power and efficiency.[2] The secret is

**Variable Compression Turbo**

its unique multi-link system that varies the engine compression ratio between 8:1 for more power to 14:1 for greater mileage. Today, the choice between a powerful engine or an efficient one is over. Have both.

## TECH THAT HELPS LOOK OUT FOR YOU

As automotive technology becomes more advanced, we are striving to find new ways to anticipate the dangers around you. Many are INFINITI world's first technologies like Predictive Forward Collision Warning,[5] which can alert you to a potential collision two cars ahead. Around View® Monitor with Moving Object Detection,[10] on QX50 ESSENTIAL, which uses four cameras and one virtual composite 360° view to elevate parking.[11] Finally, Blind Spot Intervention® on the ProASSIST Package helps detect cars in your blind spot area and can intervene to help avoid a collision.[12]

## 2019 Nissan Altima



### THE WORLD'S FIRST PRODUCTION VARIABLE COMPRESSION TURBO ENGINE[1]

Imagine an engine so smart it seems to anticipate what you want. Whether it's turbocharged power that pushes you back in your seat or impressive fuel efficiency, even in city streets,[16] Altima's all-new shape-shifting VC-Turbo™ engine lets you have both – without compromise.[1]

### SAFETY SHIELD® 360

Nissan Intelligent Mobility is changing how you move forever with technology that makes you feel more connected, confident, and excited.

As part of Nissan Intelligent Mobility, Safety Shield 360° includes features that help you see more, sense more, and can give you an assist when you need it. The following features are standard on trim levels SV and above.[2]

| Automatic Emergency Braking with Pedestrian Detection[5] | Rear Automatic Braking[6] | Rear Cross Traffic Alert[7] | Blind Spot Warning[8] | Lane Departure Warning[9] | High Beam Assist |

**2021 Nissan Altima**

Unlock the pure joy of driving. How? With the world's first variable compression turbo engine.[1] A suite of available safety features that can respond to the world around you in real time.[2] Confidence from available Intelligent All-Wheel Drive.[3] And surprising connectivity before you even reach the driver's seat.[4] Nissan Altima.[5] This is tech that changes every part of your drive. This is Nissan Intelligent Mobility.™

**The world's first production variable compression turbo engine**[1]

Imagine an engine so smart it seems to anticipate what you want. Whether it's turbocharged power that pushes you back in your seat or impressive fuel efficiency, even in city streets,[17] Altima SR's shape-shifting VC-Turbo™ engine lets you have both – without compromise.[6]

**2023 Nissan Rogue**

Power or efficiency? Yes

**37**
hwy mpg[8]

**201**
horsepower

**225**
lb-ft of torque

Go Rogue® with the kind of numbers designed to exhilarate your soul and satisfy your conscience. It starts with the revolutionary Variable Compression Turbo (VC-Turbo®) engine that can deliver low-compression, turbocharged power and then transform to provide high-compression efficiency.[8] All of which means you get the best of both worlds in one engine. Thrilling power. Long-distance efficiency. No compromise.

25



109. The Engine Defect is dangerous, causing hesitation, lack of acceleration, loss of power and/or total engine failure and thereby increasing the risk of a collision.

110. Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential automobile defects, and imposes a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114, Stat.1800 (2000).

111. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id*. Thus, Defendants knew or should have known of the many complaints about the Engine Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, NNA and NMC to the Engine Defect.

112. With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Engine Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Engine Defect. In addition, the complaints indicate that despite having knowledge of the Engine Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or

otherwise attempt to repair it while Class Vehicles were still under warranty. (Spelling and grammar mistakes remain as found in the original):

**2019 QX50**[4]

October 23, 2018
NHTSA ID Number: 11142301
Incident Date October 5, 2018

> VEHICLE 2019 INFINITI QX50 PURE 4DR SUV AWD (2.0L 4CYL TURBO CVT) REVIEW WE HAVE THIS CAR ABOUT 3 MONTHS NOW. HAVE APPROXIMATELY 3500 MILES ON IT. WE EXPERIENCING A HUG DEFECT ON THIS CAR. IN OCTOBER, I DROVE THE INFINITY TO THE GYM IN THE MORNING 5:20AM. IT WAS LESS THAN 1 MILES AWAY, PARKED THE CAR OUTSIDE ABOUT 70 MINUTES. WENT HOME, PARKED THE CAR IN THE GARAGE 2 HOURS. WHEN I GOT IN THE CAR AND STARTED, THE FAN CAME ON. IT WAS SO LOUD THAT WE CAN HEAR IT INSIDE THE CAR WITH ALL WINDOWS UP. IT WAS ON OVER 40 MINUTES FROM MY HOUSE TO WORK. GOT TO WORK, SHUT OFF THE ENGINE, RESTARTED THE CAR, THE FAN IMMEDIATELY CAME BACK ON. THIS HAPPENED 4 TIMES NOW. WE DO BELIEVE SOMETHING IS NOT RIGHT. TOOK IT BACK TO THE DEALER, THEY CANNOT FIX IT, SAID IT IS PER DESIGN, NOT A DEFECT. BOUGHT THIS AS A LUXURY CAR, NOT LUXURY AT ALL. NOW, I AM WORRYING ABOUT THE SAFETY OF MYSELF AND MY PASSENGERS. NOT SURE WHEN OR IF THE ENGINEER IS GOING TO DIE ON THE HIGHWAY. IF ANYONE HAS THE SAME PROBLEM PLEASE REPORT IT. WE ARE AT A LOSS REGARDING WHAT TO DO NEXT. WOULD NOT RECOMMEND TO BUY, THERE IS STILL A LOT OF PROBLEMS ON THIS VEHICLE TO WORK OUT.

April 15, 2019
NHTSA ID Number: 11196440
Incident Date April 15, 2019

> AT STOP LIGHTS THE CAR WILL IDLE ROUGHLY LIKE IT WILL STALL THEN IT WILL ALSO JUMP FORWARD.

June 24, 2020
NHTSA ID Number: 11330578
Incident Date June 23, 2020

---

[4] Available at https://www.nhtsa.gov/vehicle/2019/INFINITI/QX50/SUV/AWD#complaints. References to "VCR" are references to "Variable Compression Ratio"

CAR WOULD NOT DRIVE UPON PRESSURE OF THE GAS PEDAL PLACING DRIVER IN IMMEDIATE DANGER. DRIVER PULLED OVER MULTIPLE TIMES, SHIFTED CAR INTO PARK AND TURNED CAR OFF, PROCEEDED TO ATTEMPT TO DRIVE AGAIN. AFTER FOURTH TIME, THE TRANSMISSION/ENGINE RESPONDED. THIS CAR WAS RETURNED TO AUTONATION INFINITI OF TUSTIN TWO DAYS AFTER PURCHASE, THE DEALERSHIP INFORMED THEY WOULD PLACE THE CAR BACK ON THE LOT WITHOUT INSPECTION, THIS CAUSES GREAT CONCERN FOR THE SAFETY OF ANY FUTURE DRIVERS OF THE CAR. *TR

May 17, 2023
NHTSA ID 11658820
Incident Date May 17, 2023

My engine blow at 50,000 miles and now my VCR actuator has gone bad as well

March 15, 2024
NHTSA ID Number: 11577709
Incident Date February 29, 2024

Engine acceleartion issue. Rpm goes high but car struggle to speed up.. At first it happened when car was at stop light, struggle to move forward.. took to Grubbs infiniti.. At first,dealer could not replicate the issue, but luckily I had taken the video of the issue I had. Than the dealer was finally able to experience the issue themselves and replaced the transmission thinking that was the issue. I took the car after repair and within 3-4 days I had the same issue. This time I was driving in a freeway at 60 mph. When I hit the gas pedal to accelerate faster,the engine RPM went high but instead of speeding up, car felt like slowing down. So i exited the freeway to service road. Once the speed went down to 20mph, it didn't go any higher than that.This time there was a check engine light on I took it back to the dealership .They again could not replicate the issue and just did the ECM software update. I took the car home but after driving less than 20 miles,the car had the same issue. I again took it back to delearship. This time they are replacing something called VCR..Still waiting now

February 18, 2025
NHTSA ID: 11643569
Incident Date February 16, 2025

Engine destroyed itself upon acceleration on highway. Variable Compression system malfunctioned, metal shaving found in oil, and engine no longer starts. Check engine light flashed after acceleration, and then engine lost all power. Car coasted to a stop as engine couldn't make power

March 27, 2024
NHTSA ID Number: 11579772
Incident Date March 24, 2024

About five months ago, while driving on the highway, the care would say it's in Drive, but sounded like it couldn't get out of 1st gear and I'd get high RPMs. Thankfully there was stop-and-go traffic and I didn't have to exit pull off the highway or hit high speeds. I exited at the next exit and, as soon as the car stopped, it wasn't possible to get it into gear. Eventually the car started and I was able to get into gear and drive it using Manual drive mode. Once at the dealership we were told it was a bad VCR and they needed to replace that to get it going. That was around 38,000 miles. This most recent incident, I had just gotten onto the highway when I started to hear a low whiney noise when pressing the accelerator. I only had a few miles till my exit and decided to continue, thinking it might just be debris or something. After exiting, I literally rolled into the gas station because the car, despite being in Drive, was not in gear. The car stalled and I couldn't get it started, or I could get it started, but it refused to go to Neutral to allow me to push it out of the way. Eventually, the car started and I was able to put it into Drive. Thinking it was the same issue, I planned to drive it the 2 miles

home. I made it to the first traffic light and the car turned off, leaving the me stranded in the middle lane of the road. I called the police and tow trucks to come help me get the car moved (no one knows how to put the car into an emergency Neutral position including the 2 officers, 4 tow truck drivers and an Infiniti mechanic that was driving by). Eventually the tow truck came and I was able to drop it off at the dealership, who have told me there is "a chunk of bearing material in pan with copper particulates." I'm currently around 40,000 miles.

2020 Infiniti QX50[5]

June 4, 2025
NHTSA ID Number: 11664985
Incident Date May 27, 2025

---

[5] https://www.nhtsa.gov/vehicle/2020/INFINITI/QX50/SUV/AWD#complaints

Pulled out into an intersection with limited visibility. Once I got into my lane I observed a car behind me that I had not seen. I tried to accelerate to avoid being hit. My car began making a knocking sound with loss of power. The other car went around me on the shoulder to avoid a collision. Infiniti of Birmingham (Alabama) says that one of the bearings in the engine spun and there is metal shavings in the oil pan. They say I need a new engine with only 68,000 miles. They are "unsure" if Infiniti will warranty the cost of repairs. Absolutely ridiculous! Please help!

2021 Infiniti QX50[6]

March 15, 2024
NHTSA ID Number:11577561
Incident Date February 7, 2024

I purchased this 2021 QX50 Infiniti on [XXX] and have experienced consistent engine knocking. In checking out this problem, I have found that it is apparently a widespread problem with the engine in 2021 QX50 vehicles and can possibly lead to engine lock up and engine failure. The engine thus far has not locked up or failed. I have reported the issue to the dealership, Infiniti of Gwinnett located at 3090 Satellite Blvd, Duluth, GA 30096 and am scheduling to have the dealership investigate the problem. Needless to say this is a major concern and if there are ongoing NHTSA investigations and findings I definitely want to be made aware of same. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

October 25, 2024
NHTSA ID Number: 11621911

---

[6] https://www.nhtsa.gov/vehicle/2021/INFINITI/QX50/SUV/FWD

Incident Date October 8, 2024

> Without any warning or indicator light on the dash, the vehicle lost power when pulling out of our driveway - we live on a main road and were very lucky not to be hit by upcoming traffic. The car went into limp mode and would not accelerate past 20mph. We have been fighting with Infiniti for the last three weeks as no one can find the problem and they finally said a new engine was needed. There is on 35,000 miles on this car and we had to fight to have this replacement covered under warranty. Now that parts are back ordered and we are not receiving any help. We are three weeks without a vehicle and have no loaner vehicle. No one at Infiniti can give a timeframe for the resolution of this issue, what caused this issue and we are now very fearful that this will happen again - even with an engine replacement. This was very scary for our family and we are amazed that there was no indicator light or warning. The car didn't make any noises and was running great and then all of a sudden it would not go. Very alarming to say the least!

2022 Infiniti QX50[7]

January 29, 2024
NHTSA ID Number: 11568472
Incident Date July 29, 2023

> The contact owns a 2022 Infiniti QX50. The contact stated while driving from a complete stop, the engine made an abnormal knocking sound. There was no warning light illuminated. The contact stated that the failure had been recurring intermittently while driving from a complete stop. The dealer and the manufacturer were not notified of the failure. The vehicle was not diagnosed or repaired. The failure mileage was approximately 3,000.

---

[7] https://www.nhtsa.gov/vehicle/2022/INFINITI/QX50/SUV/AWD#complaints

2019 Nissan Altima[8]

May 18, 2021
NHTSA ID Number: 11417612
Incident Date January 15, 2020

THE CONTACT OWNS A 2019 NISSAN ALTIMA. THE CONTACT STATED WHILE DRIVING, THE RPM STARTED TO FLUCTUATE PRIOR TO THE VEHICLE STALLING WITHOUT WARNING. ADDITIONALLY, ON SEVERAL OCCASIONS, WHILE AT A STOP LIGHT, THE VEHICLE SUDDENLY TURNED OFF WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE LOCAL DEALER TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE AIR INTAKE SENSOR WAS FAULTY AND NEEDED TO BE REPLACED. THE AIR INTAKE SENSOR WAS REPLACED HOWEVER, THE FAILURE PERSISTED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 12,000. THE CONSUMER STATED THE VEHICLE WAS REPAIRED 3 TIMES, BUT THE FAILURE PERSISTED.

March 28, 2024
NHTSA ID Number: 11579951
Incident Date March 28, 2024

I have had several issues with this vehicle despite frequent oil changes and maintenance. Most recent issue is below: Immediately upon parking at 0900 on a clear, sunny warm day, an warning appeared on my dashboard - "engine malfunction, power reduced, service now". At the same time, my engine shut off suddenly. No one was injured, as I had thankfully just parked. This was the first time this specific warning and malfunction occurred. The contact took the vehicle into a Nissan service center. The diagnosis DTC P0101 stored, excessive buildup in throttle chamber causing DTC possibly relating to the engine failure.

---

[8] https://www.nhtsa.gov/vehicle/2019/NISSAN/ALTIMA/4%252520DR/FWD

2020 Nissan Altima[9]

February 19, 2021
NHTSA ID Number: 11396918
Incident Date: February 19, 2021

DURING COLD TEMPERATURES THE CAR ACCELERATES
POORLY, ENGINE RPM IS UNUSUAL. AT LEAST ONE INSTANCE
OF THE ENGINE WARNING LIGHT ILLUMINATES WITH A
"SERVICE NOW" MESSAGE DISPLAYED. IN ALL CASES THE
VEHICLE ENGINE WAS RUNNING, IN (SLOW) MOTION, AND ON
A CITY STREET AND ONE INCIDENT ON A HIGHWAY GOING
STRAIGHT AHEAD. A SERVICE DEPARTMENT OF A NISSAN
DEALER WAS CONTACTED AND THEY STATED THAT THEY
HAVE RECEIVED MULTIPLE COMPLAINTS OF THIS NATURE
ABOUT THIS CALL YEAR AND MODEL.

January 28, 2023
NHTSA ID Number: 11504210
Incident Date: January 28, 2023

I was driving the car at about 70 mph on the expressway and it
just randomly de-accelerated dripping from 70-34 mph and
would not allow me to accelerate and then proceeded to shut
down stating engine stall I almost got hit from the back when
the car de-accelerated and couldn't do anything about it after
about 10-15 seconds I pressed the gas again and it took off
abruptly. I'm scared to drive my car anywhere that I'll get hit if
my car de-accelerates again. Nissan can't replicate the issue to
come up with a conclusion.

June 1, 2024
NHTSA ID Number: 11591858
Incident Date: May 21, 2024

---

[9] https://www.nhtsa.gov/vehicle/2020/NISSAN/ALTIMA/4%252520DR/AWD#complaints

Engine failed prematurly with less than 40k miles. All service was completed in a timely fashion. Nissan is taking a long time to get back to me with what next steps are. They are still investigating after 10 days. Pls help.

June 20, 2024
NHTSA ID Number: 11595567
Incident Date June 20, 2024

I was driving on the Freeway and without warning my car reduced speed. Then there was a warning bell that showed engine malfunction power reduced. Then the check engine light came and my rear and front warning indicator came on

July 9, 2024
NHTSA ID Number: 11600421
Incident Date June 17, 2024

RECEIVED ENGINE MALFUNCTION REDUCED POWER SERVICE NOW MESSAGE WHILE DRIVING (RECEIVED MESSAGE 6 TIMES SO FAR). ERROR GOES AWAY WHEN I SHUT CAR OFF AND RESTART IT, NO CODE IS FOUND WHEN SCANNED AT NISSAN DEALERSHIP. CAR SEEMS TO SHIFT WEIRD DURING A STOP AND FEELS LIKE IT RUNS ROUGH BUT NOTHING IS EVER FOUND AT DEALERSHIP TO BE THE CAUSE.

2021 Nissan Altima[10]

May 13, 2025
NHTSA ID Number: 1166084
Incident Date April 7, 2024

---

[10] https://www.nhtsa.gov/vehicle/2021/NISSAN/ALTIMA/4%252520DR/AWD#complaints

The contact owns a 2021 Nissan Altima. The contact stated that while driving at various speeds on several occasions, there were abnormal sounds coming from the engine compartment. The contact inspected the vehicle and sent off an oil sample. The contact stated that a metal fragment was found in the engine oil. The vehicle was not diagnosed or repaired. The manufacturer was not notified of the failure. The failure mileage was approximately 51,000.

2021 Nissan Rogue[11]

February 28, 2021
NHTSA ID Number: 11398240
February 16, 2021

ENGINE LIGHT AND OIL LIGHT COMES ON AND THE VEHICLE JERK WHEN PARKED AND ATTEMPTING TO TURN THE ENGINE OFF.

October 18, 2021
NHTSA ID Number: 11437256
Incident Date October 9, 2021

The contact owns a 2021 Nissan Rogue. The contact stated while driving at various speeds, the vehicle would not accelerate while the accelerator pedal was depressed. The contact stated that the check engine warning light was illuminated. The vehicle was taken to a local dealer but was not diagnosed. The manufacturer was not informed of the failure. The failure mileage was approximately 2,000.

January 8, 2022
NHTSA ID Number: 11446756
Incident Date December 4, 2021

---

[11]

The vehicle keeps throwing a warning on the dash that states "Engine Malfunction Power reduced Service now" and the performance of the vehicle becomes severely limited. I have had two dealerships attempt to diagnose and repair the issue and the last report back is "Customer States Reduced Powertrain Message Comes on cluster, found same concern on techline data base, no repair can be made at this time. concern still under engineer review".

March 7, 2023
NHTSA ID Number: 11510712
Incident Date March 5, 2023

I was driving on I-5 (nighttime) when the engine suddenly lost all power. I was able to pull over to the shoulder, but it was dangerous. The dash displayed something along the lines of: Engine malfunction power decrease

August 7, 2023
NHTSA ID Number: 11536962
Incident Date August 6, 2023

I was driving on 85 south @10:15 am it was very busy traffic and all of a sudden the vehicle starts loosing power all kinds of lights came on the panel engine malfunction also was on the panel it was so scary.I was trying to get off the highway safely the steering wheel was hard to turn.I saw2 18 wheelers & other vehicles coming I really thought I was going to die.

August 10, 2023
NHTSA ID Number:11537800
Incident Date August 10, 2023

> The car just shut down while it was on and I was in it. Luckily I was at a stop. This is the second time it has happened in 6 months. It would be scary if it happened if it happened on the freeway. I do not feel safe driving this vehicle.

October 26, 2024
NHTSA ID Number: 11622038
Incident Date October 25, 2024

> The engine revs a s will not accelerate. I have to stop put car in park and turn it off and on. This has happened many times. Dealership says they can't do anything unless an engine light or code is present. I even showed them videos.

2022 Nissan Rogue[12]

February 13, 2025
NHTSA ID Number: 11642518
Incident Date February 7, 2025

---

[12] https://www.nhtsa.gov/vehicle/2022/NISSAN/ROGUE/SUV/FWD#complaints

I was driving and began hearing knocking sounds from under the hood. The car began dragging, so I was afraid to go at any speed over 25 or 30. I was almost home and it was night, so I resolved to go to the mechanic by my house the next morning. When I set out to go to the repair shop, the car was knocking louder, and I did not go more than a mile before the car stalled at a stoplight. It shuddered and then cut off. I tried to restart it, but it kept coming on and going off right after. I was in the turning lane, and had on my hazard lights, but several motorists still came up close behind me and honked their horns for me to move. This happened about a dozen times before the tow truck arrived. One man came up beside me, yelling and making gestures (I kept my window up and ignored him). I called AAA and was towed about a mile to the shop. The shop owner checked the oil to see if I had run out of oil - I had not. He then said to have it towed to Nissan because it was under warranty and the "engine is done." He said that due to the sounds he heard coming from the engine. Days later (it was Saturday, and Nissan was not open Saturday or Sunday) I had it towed to Nissan and they have yet to diagnose the problem, after several days.

February 26, 2024
NHTSA ID Number: 11574070
Incident Date December 2, 2023

My son and I were driving home and my 2022 Nissan rogue SV suddenly began making extremely loud banging and knocking sounds in the engine bay. We were traveling approximately 40 mph and did not hit any bumps. The following morning the vehicle was towed to the dealership for inspection and we were told that day that the engine would need to be replaced. While we did not get too many specifics from the dealership regarding the exact cause, it was related to some bearings of some sort and causing what is called rod knock. The vehicle remain at the dealership until a new engine , or new engine parts, could be delivered. Nissan's warranty covered the cost of the repairs since the vehicle only had roughly 15,000 miles on it when the incident occurred. I have not had the vehicle inspected by a third party to confirm that the entire engine was replaced or if only certain parts were. One of the technicians at the dealership mentioned that they had seen or heard whispers about several reports of this particular issue, which is part of why they were able to diagnose it so quickly, but couldn't confirm the exact cause of that engines failure. Prior to the engine failing, there were no warning lights or indicators present in the vehicle. The vehicle has received regularly scheduled maintenance at this dealership since it's purchase. This incident occurred on December 2nd, 2023. I took a video the night of the incident of the vehicle and the knocking sounds it was making , but I can't upload it via this incident report, so let me know if you would like it and I will send it another way.

May 29, 2025
NHTSA ID Number: 11663757
Incident Date May 15, 2025

Driving vehicle around 60 mph. Heard load knocking noise coming from engine then vehicle instantly lost power. Engine reduced power came across display and it had virtually no power to get to side of road. I called dealer and I they said I would have to pay to tow it there and pay to diagnose engine problem because I was out of warranty. Got vehicle towed back to my house by myself. Load knocking noise heard from engine.

2023 Nissan Rogue[13]

February 2, 2023
NHTSA ID Number: 11505088
Incident Date January 13, 2023

The Engine Malfunction power Reduced just pop up, and even i push the accelerator pedal to the floor, it almost dont run, I almost stuck in the center of the Traffic Crossing.

May 10, 2023
NHTSA ID Number: 11521390
Incident Date March 31, 2023

While attempting to accelerate up a hill the vehicle's engine rapidly increased RPM to 3500 and then down to 2000 and back up to 3500 repeatedly with no increase in speed or change of pressure on the gas pedal. Also, from a stopped position at a red light, the vehicle would shudder/shake when the tachometer reported between 1500 and 2000 RPM, while attempting to accelerate. Finally when shifting from reverse to drive, the vehicle would shake/shudder while the RPM would increase to 4000 all while the car did not accelerate at all, and with no increase in pressure on the gas pedal.

---

[13] https://www.nhtsa.gov/vehicle/2023/NISSAN/ROGUE/SUV/AWD#complaints

June 9, 2023
NHTSA ID Number: 115266248
May 10, 2023

On May 10, 2023 my 2023 Nissan Rogue with 16,633 miles on it suffered an engine malfunction and completely stalled unexpectedly on an off-ramp of State Route 28. There were no warning lights or indicators that flashed. My car would not restart. If this would have happened minutes if not seconds sooner while I was on the highway, no vehicle behind me would have been able to stop and someone would have been seriously injured. It was later determined the engine completely seized due to metal shavings being that were found in it. The engine was replaced under warranty at a dealership but given the newness of my car and the fact that I drive more miles to work and back than most people, I worry that this could happen to other 2023 Nissan Rogues that have not been driven that much. A cause was never relayed to me as to what happened. I asked for various information from the dealership in regards to diagnostic reports, daily work logs and so on. I received only a 3 page invoice with no listing of specific diagnostics that were completed on my car. I am driving a car that could suffer the same malfunction and the dealership did not seem the least bit concerned about the potentional safety hazard this situation could have created. I was told by the dealership that the new technology had not been fully tested and this was a risk of buying a brand new car. I understand minor issues with a new car but metal shavings in an engine is not minor. I am not sure if the engine is available for inspection.

113.    Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendants' awareness of the problems with the engine, the variable compression system, and/or related components and how potentially dangerous the defect is for

consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendants itself, but also because NNA employs staff to monitor the perception of the brand in the United States and North America, and shares that data with NMC. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

 **r/NissanRogue** · 3 mo. ago
Illato
···

## 2023 Nissan Rogue Engine Failed at 64K Miles – $9,000 Bill, No Warranty Help!

2023 Nissan Rogue Engine Failure – Never Buy a Nissan!

I own a 2023 Nissan Rogue, and at 64,000 miles, the engine completely failed. I took it to the dealer twice before for engine issues, but both times, they told me, "There's nothing wrong." Now, I'm stuck with a $9,000 repair bill, and since my warranty expired just 4,000 miles ago, Nissan refuses to help in any way.

This isn't just my issue—many 2023 Rogue owners are experiencing engine problems, yet Nissan refuses to acknowledge it and leaves customers stranded. They're great when selling you the car, but the moment you have an issue, you're on your own.

If you're considering buying a car, stay far away from Nissan! Go with Toyota, Honda, or Kia—at least they stand by their customers when problems arise. Don't trust Nissan!

*See* https://www.reddit.com/r/NissanRogue/comments/1jmg29q/2023_nissan_rogue_engine_failed_at_64k_miles_9000/

 Nissan Rogue 2021 & UP Owners · Join
Peter Joseph · June 24, 2024 · 🌐

TOTAL ENGINE FAILURE! 22 Rogue Platinum with 35k miles. Another member recently posted on here with the same issue. Supposedly this is very common and if your Vin# starts with J or 5 your engine could be at risk. Spark plugs broken, all coolant sucked into cylinders and engine block is cracked. They approved a new motor, turbo and catalytic converter. The converter is currently on backorder with no ETA. 9 lease payments to go not knowing how long my car will be at the dealer. I will be 1 and done with nissan after this.

*See* https://www.facebook.com/groups/837297303796997/posts/1573474300179290/

## engine knocking problems

→ Jump to Latest

👁 1.6K views   💬 11 replies   👤 7 participants   🕐 last post by Prophecy99 Sep 30, 2024

**A** **angellnandez** ✅ **Discussion starter**
5 posts · Joined 2024                                                ⋮

#1 · Sep 26, 2024

i recently bought a 2019 q50 3.0t less than 6 months ago. It's currently at 55,520 miles with major engine problems. i took it to my local Nissan where they basically told me that i needed a new engine. they told me it could possibly be a blown head gasket or piston rings collapsed. but how could this be possible if i just got the car? i took it to get an oil change on July 30th but only drive the car to work and back and drive it out on the weekends. i wouldn't abuse the care really, the car is completely stock.

yes, I tried to see if I have a manufacturer engine warranty since the vehicle literally only has 55,000 miles, i contacted Infiniti and they told me that the engine warranty has been voided. I know these engines are expensive.

I honestly just don't know what to do at this point. i contacted the dealership where I got it from and they told me I have to wait for a response from management which will be tomorrow or the Monday that's coming up.

*See* https://www.infinitiq50.org/threads/engine-knocking-problems.146081/

3.0 ⭐⭐⭐☆☆

Engine problems already

June 14, 2019
By MBryant from Olathe, KS
**Owns this car**

I've only owned the car for two months and I've already had to take it in to be serviced due to rattling and vibrations when accelerating. The service center advised they are seeing this problem on the new QX50 but are not sure engineers have found a fix for it. I was told "well it doesn't affect your car's ability to drive, so...". I expected more from a luxury SUV. Very disappointed.

*See* https://www.cars.com/research/infiniti-qx50-2019/consumer-reviews/?page=5

## IV.    Defendants Had Superior and Exclusive Knowledge of the Defect Through Other Sources

114.    Since 2018, if not earlier, NMC has designed and manufactured the Class Vehicles, and, with NNA, has marketed, sold, and distributed them. As the designer, manufacturer,

distributor, seller, and lessor of the Class Vehicles, Defendants recorded and monitored their performance and quality through a variety of means not available to the public, including pre-production testing, failure mode analyses, warranty data, replacement part sales, complaints from customers and dealerships, quality control audits, internal investigations as to warranty and complaint data, development of Technical Service Bulletins ("TSBs")and other communications issued exclusively to authorized dealerships and service providers (which are not disseminated to consumers) attempting to address the Engine Defect, and durability testing.

115.    Discovery will show that the Class Vehicles are defective and that this non-public data gave Defendants superior and exclusive knowledge of the Engine Defect.  As such, Defendants knew or should have known that the Engine Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

116.    Defendants are experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendants conduct tests, including pre-sale quality control testing, on incoming components, including the L-Link, other links, and bearings in the variable compression system, to verify the parts are free from defecst and align with NMC's specifications. Moreover, pre-production durability testing would have necessarily revealed that the components of the variable compression systemwere prone to failure well before the designed for and specified useful life of the components had elapsed.

117.    Defendants work on the VC Turbo engine was particularly long, beginning in 1998. Defendants explained their comprehensive testing of vehicles, which they call "running tests," which occurs during the development and production phases of vehicle construction. As described by Defendants: "We use a factory test car during development, and then a mass-production test car during production." The purpose is to address issues that make themselves known during "rigorous, repetitive, high-precision tests over a short period of time, in some instances driving the cars for 24 consecutive hours or more. At Nissan, we refer to these systematized local running tests as PSQC [or Pre SOS Quality Clinic] tests. Our test drivers conduct thorough checks on

handling, drivability, engine noise and various other aspects…" [14]  Many of these tests are also durability tests, run over the many proving grounds that Defendants maintain throughout the world.

118.    These tests and Defendants' analyses thereof lead to the issues of Infiniti Service Bulletin ITB19-003 on February 2, 2019.  This bulletin informed dealerships, but not consumers, to reprogram the ECM if they heard a spark knock or knocking type noise coming from the engine at low RPM or at low speeds, without setting a Diagnostic Trouble Code.[15] At the time of this TSB's issuance, the 2019 QX50 was the only vehicle with a VC-Turbo engine.

119.    On July 3, 2019, Defendants issued a stop sale order on over three hundred QX50 vehicles, saying "[t]hese vehicles may experience an engine c-link bearing failure during operation, which could lead to engine seizure." This Campaign Bulletin only identified vehicles that at not yet be sold – there is no mention made of those already sold to consumers.

120.    By July 12, 2019, Defendants issued an update.  The Campaign Bulletin called for "VCR Engine Inspection" for these 324 unsold vehicles. If gold colored debris was found in the lower engine oil pan, the vehicle would not be allowed to be sold. But if no debris was found, the cars could be sold.  Again, no mention was made regarding previously sold units.

121.    On the same day, Defendants issued Campaign Bulletin for 356 2019 and 2020 Altimas with VC-Turbo engines. As with the QX50s, if gold colored debris was found in the lower engine oil pan, the vehicle would not be allowed to be sold. But if no debris was found, the cars could be sold.  Again, no mention was made regarding previously sold units.

122.    Defendants failed to issue any subsequent bulletins regarding the variable compression system in Class Vehicles, but in 2024 was forced to respond to a late 2023 NHTSA investigation into the engines.  NHTSA started the investigation in response to numerous complaints of sudden, catastrophic engine failure in these engines.  In Defendants' response, they claimed "Nissan has closely monitored the launch of these innovative turbocharged engines and

---

[14] https://www.nissan-global.com/EN/SUSTAINABILITY/SOCIAL/QUALITY/PRODUCTS/GUARANTEE/
[15] Diagnostic Trouble Codes, or DTCs, are pre-programmed codes which are "set" by the ECM when it detects certain conditions. In order for a DTC to set, thus potentially triggering the check engine light, a specific set of conditions has be programmed into ECM and flagged as a serious condition.

has had several quality investigations and counters to improve performance and customer satisfaction." They included 10 "projects" to investigate bearing failure.

123.    Defendants further explained:

> Nissan has identified bearing failures within the KR20DDET and KR15DDT engines. Bearings are in multiple locations within an engine providing support to components as they rotate. In a conventional internal combustion engine (ICE), bearings support rotation of the crankshaft, camshaft and connecting rod. In VCT engines, additional bearings are required to support rotation of the A-Link, C-Link, L-Link and other rotating components not present in conventional ICE vehicles. With respect to the VCT engines produced by Nissan, the specific bearings Nissan has investigated vary among the two engines. For the KR20DDET engine, the C-Link and/or L-Link bearings are noted as the primary causes, whereas the main bearing supporting the crankshaft is a primary cause for the KR15DDT engine.

124.    In their response to NHTSA, Defendants minimized the total number of warranty issues and complaints, and further noted that the number of complaints was diminishing. However, Defendants also claimed that these failures would always be preceded by engine noises or other warnings, and thus, total engine failure could avoided. As demonstrated by the complaints above, and the experiences of Named Plaintiffs, such warnings only work  if the Nissan and Infiniti dealership respond appropriately to reports of unusual engine noises, which they often did not. As such, the true number of reports could be obscured.

125.    Further, Defendants' claim that both VC-Turbo engines underwent "manufacturing quality process improvements" to address bearing problems leaves early purchasers without recourse, since their defectively manufactured engines were not recalled. Nor are those "improvements" even a total repair for the Engine Defect, as can be seen by the multiple of engine failures for engines manufactured in 2023 or later.

126.    On or about June 27, 2025, Defendants announced a recall for vehicles with the 3-cylinder 1.5L (KR15DDT) or 4-cylinder 2.0L (KR20DDET) variable compression turbo engines (the "Recall"). The vehicles have production dates from October 6, 2017 to August 1, 2024 and include 2019 to 2022 Infiniti QX50, 2021 to 2024 Nissan Rogue, 2019 to 2020 Nissan Altima, and 2022 Infiniti QX55 vehicles. The listed manufacturer is NNA.

127.    The Recall states:

Nissan has identified bearing failures in certain vehicles equipped with the subject 3-cylinder 1.5L or 4-cylinder 2.0L variable compression turbo engine (VC-Turbo) engines. A potential manufacturing defect in specific engine bearings (main, A-, C-, and L-link) or supporting engine components may cause engine damage and potentially lead to engine failure…

Bearing failures are not typically instantaneous and tend to progress over time, allowing drivers to receive multiple forms of audible and visible advance warnings, including abnormal noise from the engine compartment, rough running, malfunction indicator lights (MIL), and warning messages in the instrument cluster.

128.    The Recall also describes the associated safety risk: "If the engine fails while driving, it case result in a loss of motive power (LOMP), increasing the risk of a crash."

129.    However, the remedies available under the Recall are not sufficient to actually repair the Defect.  The recall remedy primarily consists of an inspection of the Class Vehicles' oil pain for the presences of "specific metal debris." If there is "no debris [] detected during the inspection," vehicles with the 1.5L engine will have the oil pan gasket and engine oil replaced, and the vehicle's ECM will be reprogrammed while vehicles with the 2.0L engine will simply have the engine oil replaced.  For vehicles "where the specific debris is detected and confirmed by Nissan Powertrain Call Center, dealers will be instructed to replace the engine."

130.    This Recall is not a repair for the Defect. For the vast majority of owners, it amounts to simply a few oil changes.  For the rest, they will receive equally defective parts, as can be seen by the experiences of Plaintiff Coney who has received multiple new engines, including after the production date noted in the Recall.

131.    Further, while Defendants are further offering reimbursement of pre-notification repairs attributable to the issues they specifically review and approve, it does not include reimbursement of towing expenses, the costs of alternative transportation, or the loss of the use of the Class Vehicles.

132.    Moreover, dealership will not be notified of the Recall until July 15, 2025 and the insufficient remedies will not be available to Class Members until August 25, 2025 at the earliest.

133.    Thus, given the extensive testing, monitoring of consumer complaints, warranty requests, and part requests, Defendants knew or should have known the variable compression system, and/or related components were defective and prone to putting drivers in a dangerous position due to the inherent risks of the Engine Defect. Their attempts to mitigate their costs in addressing the Defect via ineffective repairs and the ineffective Recall confirm the existence of the Defect, but do not provide meaningful relief to Class Members.

**V.    Defendants Have Actively Concealed the Defect**

134.    Despite their knowledge of the Engine Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose or actively concealed from Plaintiffs and Class, at and after the time of purchase, lease, or repair:

(a)    Failed to disclose, at the time of purchase or repair or thereafter, any and all knowledge material defects and material nonconformities of the Class Vehicles, including the Engine Defect and the extent to which it exists in Class Vehicles;

(b)    Failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose;

(c)    Failed to disclose and/or actively concealed the fact the Class Vehicles were defective, despite the fact that Defendants leased of the Engine Defect before it placed the Class Vehicles in the stream of commerce; and

(d)    Failed to disclose and/or actively concealed that the warranties given to Plaintiffs and other Class Members would not be honored to permanently repair the Engine Defect.

135.    Discovery will show that when consumers present their Class Vehicles to an authorized Nissan dealer for repairs to the engine, as required to do so by the terms of the Nissan

and Infiniti warranties, rather than repair the problem under warranty, the dealerships either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Engine Defect, including replacing defective parts with other, similarly defective parts. For example, Plaintiff Coney, among other Class Members, was told the noises the engine in her vehicle was making were "normal" and her car was functioning as designed. Other Class Members report being told, per the instruction of the TSB, to make sure they were using premium gasoline.

136.    Defendants have caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicle's engines and/or engine components, despite Defendants' knowledge of the Engine Defect.

137.    As a result, Class Members continue to experience the Engine Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing), and diminution in value is not sufficient.

138.    Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

139.    As a result of the Engine Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

140.    The existence of the Engine Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether a vehicle's engine loses power, or stops working such that the vehicle suddenly slows or stops without warning while driven, thereby putting consumers, passengers, and bystanders in danger, is a material safety concern. Had Plaintiffs and other Class Members known of the Engine Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

141.    Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that Defendants will not sell or lease vehicles with known safety defects, such as the Engine Defect,

and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

## VI. The Relationship Between NNA and its Network of Authorized Dealerships related to NNA's Warranties

142.    In order to sell vehicles to the general public, NNA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Nissan or Infiniti-branded vehicles, the authorized dealerships are also permitted under these agreements with NNA to service and repair these vehicles under the warranties NNA provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, NNA's authorized dealerships are NNA's agents, and the consumers who purchase or lease NNA vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their NNA vehicles locally. Because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

143.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of NNA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by NNA. NNA's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of NNA's express and implied warranties, and the consumers may therefore avail themselves of those warranties. Indeed, the warranty booklets drafted by NNA and issued to Plaintiffs and Class Members indicate that NNA expects that the implied warranty of merchantability applies to the express warranty issued by NNA to the Class Members, including admonishments that the implied warranty is limited to the duration of the written warranty and is subject to state laws on implied warranties limitations.

144.    NNA issued the express warranty to the Plaintiffs and the Class members. NNA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. NNA also is responsible for the content of the Monroney Stickers on Nissan and Infiniti-branded vehicles. Because NNA issues the express warranty directly to the consumers, the consumers are in direct privity with NNA with respect to the warranties.

145.    In promoting, selling, and repairing its defective vehicles, NNA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive NNA representatives and agents. That the dealers act as NNA's agents is demonstrated by the following facts:

a.  The authorized Nissan and Infiniti dealerships complete all service and repair according to NNA's instructions, which NNA issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents;

b.  Technicians at Nissan and Infiniti dealerships are required to go to at least yearly NNA-given trainings in order to remain certified to work on Nissan and Infiniti-branded vehicles, at which they receive training on NNA-proprietary systems which provides guided, step-by-step instructions on diagnosing and repairing Nissan and Infiniti -branded vehicles;

c.  Consumers are able to receive services under NNA's issued New Vehicle Limited Warranty only at NNA's authorized dealerships, and they are able to receive these services because of the agreements between NNA and the authorized dealers. These agreements provide NNA with a significant amount of control over the actions of the authorized dealerships;

d.  The warranties provided by NNA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

e.  NNA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step instructions, and the dealerships are able to perform repairs under warranty only with NNA's authorization.

f.  NNA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and

g.  NNA implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized NNA dealerships to address complaints of the Engine Defect by prescribing and implementing the relevant TSBs cited herein.

146.    Indeed, NNA's warranty booklets make it abundantly clear that NNA's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at their "Nissan dealer" or their "Infiniti dealer." For example, the warranty booklets state that "[y]ou must take the vehicle to an authorized Nissan dealership...in order to obtain warranty service." The nearly identical language also appears in the Infiniti warranty: "[y]ou must take the vehicle to an authorized Infiniti dealership...in order to obtain warranty service." Further, the warranty "only applies to parts and components of each new vehicle that was supplied by [Nissan]." The booklets also direct Plaintiffs and class members, should they have a problem or concern, to first discuss the problem with the service personnel or owner at their authorized dealer and if it is not resolved to contact the Nissan Consumer Affairs Department or the Infiniti Consumer Affairs Department.

147.    Further, as noted by NNA on its website describing the Nissan Certified Pre-Owned program, the vehicles are actually inspected and certified by Nissan-trained technicians at authorized dealerships. In touting its inspection for Infiniti vehicles, NNA states, that every Infiniti Certified Pre-Owned vehicle "must pass a 167-point comprehensive inspection by an Infiniti trained technician." As such, authorized dealerships inspect used vehicles on NNA's behalf and its dealer's certification of quality of these vehicles is sufficient under standards published by NNA that is enough to bind NNA to the certified pre-owned warranty.

148.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of NNA for the purposes of the express and implied warranties provided by NNA to Plaintiffs and Class Members. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either NNA or its agent dealerships to establish privity of contract between NNA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and NNA.

## VII.    Defendants Have Unjustly Retained A Substantial Benefit

149.    Plaintiffs allege that Defendants unlawfully failed to disclose the alleged defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

150.    Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

151.    As discussed above therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Engine Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the defect.

152.    Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

## TOLLING OF THE STATUTES OF LIMITATION

### A. Fraudulent Concealment

153.    As previously described, any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

154.    Defendants were and remain under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by Defendants any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

155.    Defendants have known of the Defect in the Class Vehicles since at least 2019, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class members during communications with Defendants, Nissan and Infiniti Consumer Affairs divisions, and authorized dealerships.  Defendants continue to conceal the Defect to this day.

### B. Estoppel

156.    Defendants were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  Defendants actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles and their ability to live up to the terms of the warranties they provided. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

C.    **Discovery Rule**

157.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles suffered from the Defect.

158.    However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Defect caused Class Vehicles' engines lost, prematurely failed, required frequent replacement, including replacements just outside of warranty, or that the attempted repairs they received under warranty were not in fact permanent repairs of the Engine Defect.

159.    Even then, Plaintiffs and Class members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of Defendants' active concealment of the Defect.  Not only did Defendants fail to notify Plaintiffs or Class Members about the Defect, Defendants, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

160.    Thus, Plaintiffs and Class members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing the Class Vehicles' engines to lose power or fail completely, including replacements just outside of warranty.

## CLASS ACTION ALLEGATIONS

161.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

162.    The Class and Sub-Classes are defined as:

**Class**: All persons or entities who purchased or leased vehicles equipped with KR15DDT and KR20DDET engines ("Class Vehicle") in the United States.

**Florida Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of Florida.

**Missouri Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of Missouri.

**New York Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of New York.

163.    Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

164.    **Numerosity**:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

165.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing

or replacing the defective Engines. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

166.    **Commonality**:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)    whether the Class Vehicles suffer from the Engine Defect;

(b)    whether the Engine Defect constitutes an unreasonable safety hazard;

(c)    whether Defendants knows about the Engine Defect and, if so, how long Defendants have known of the Defect;

(d)    whether the defective nature of the Class Vehicles constitutes a material fact;

(e)    whether Defendants had and have a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class Members;

(f)    whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

(g)    whether Defendants knew or reasonably should have known of the Engine Defect contained in the Class Vehicles before they sold or leased them to Class Members; and

(h)    Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(i)    Whether Defendants breached their express warranties under state law and/or the UCC;

(j)    Whether Defendants breached written warranties pursuant to the Magnuson-Moss Warranty Act;

(k)    Whether Defendants are liable for fraudulent omission; and

(l)    Whether Defendants were unjustly enriched.

167. **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

168. **Predominance and Superiority**: Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

<u>**COUNT I**</u>
**Fraud by Omission or Fraudulent Concealment**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

169. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 168 above as if fully set forth herein.

170. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of each State Class under the law of each state in which Plaintiffs and Class Members purchased or leased the Class Vehicles.

171. Defendants fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles and their Engines, as well as the existence of the Defect.

172.    Despite advertising the Class Vehicles as durable, high-performance, and being of high quality, Defendants knew when it manufactured, marketed, and sold or leased the Class Vehicles that their Engines suffered from a design, material and/or manufacturing defect that reduced the Class Vehicles' value and causes variable compression system Engine components, as well as the Engine itself, to fail well before the end of the expected useful life of those components.

173.    Defendants failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles and Defendants knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Defendants sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Class Vehicles were of sound quality and that Defendants was a reputable manufacturer that stands behind the automobiles it manufactures.  Defendants engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

174.    Plaintiffs and Class Members were unaware, and could not reasonably discover on their own, that Defendants' representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

175.    Defendants had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Defect because:

    (a)    Defendants had exclusive or far superior knowledge of the Defect and concealment thereof;

    (b)    the facts regarding the Defect and concealment thereof were known and/or accessible only to Defendants;

    (c)    Defendants knew that Plaintiffs and Class Members did not know about, or could not reasonably discover, the Defect and concealment thereof; and

Nissan made representations and assurances about the qualities of the Class Vehicles and their Engines, and about the existence of a repair for the Defect, and their willingness and ability to honor their warranties that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles' Engines suffered from a systemic design and/or manufacturing defect.

176.    These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they substantially reduced the value of the Class Vehicles purchased or leased by Plaintiffs and Class Members.  Whether the Class Vehicles were defective, of sound quality, and durable, and whether Defendants stood behind the Class Vehicles, would have been an important factor in Plaintiffs' and the Class Members' decisions to purchase or lease the Class Vehicles.  Plaintiffs and Class Members trusted Defendants not to sell them vehicles that were defective and significantly overpriced.

177.    Defendants intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by Defendants and reasonably expected by consumers.

178.    Plaintiffs and Class Members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts.  Plaintiffs and Class Members did not receive the benefit of their bargain due to Defendants' fraudulent concealment.  Plaintiffs' and Class Members' actions in purchasing the Class Vehicles were justified.  Defendants were in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class Members.

179.    Plaintiffs and Class Members relied to their detriment upon Defendants' reputation, fraudulent misrepresentations, and material omissions regarding the quality, durability, and high performance of the Class Vehicles and their Engines.

180.    As a direct and proximate result of Defendants' deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Class Members suffered injury. They purchased and leased Class Vehicles that had a diminished value by reason of Defendants' concealment of, and failure to disclose, the Defect.  Plaintiffs and Class Members also paid substantial money to (unsuccessfully) repair the Defect.

181.    Accordingly, Defendants are liable to the Nationwide Class and/or State Classes for their damages in an amount to be proven at trial.

182.    Defendants have still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members.  Defendants also continue to conceal material information regarding the Defect.

183.    Defendants' acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class Members' rights.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
### Unjust Enrichment
### (On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)

184.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 183 above as if fully set forth herein.

185.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class under the common law of unjust enrichment, which is materially similar in all states.  In the alternative, Plaintiffs bring this claim on behalf of each State Class under the law of each state in which Plaintiffs and Class Members purchased or leased Class Vehicles.

186.    Plaintiffs bring this claim as an alternative to the contractual warranty claims asserted below and in the event that Plaintiffs prevail on their claims that any contract with Defendants (including any express warranty) was fraudulently induced and/or Plaintiffs prevail in proving that the warranties cannot be enforced by Defendants due to NNA having provided the

warranties only after entering into a contract with a purchaser or lessor, and/or due to NNA's intentional and deceptive efforts to conceal the Defect and avoid its warranty obligations.

187.    Defendants have received and continues to receive millions in revenue from the sale of the Class Vehicles since 2018.

188.    This revenue was a benefit conferred upon Nissan by Plaintiffs and Class Members, individuals living across the United States.

189.    Defendants manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class Members, while actively concealing the Class Vehicles' known defects and touting their quality, durability, and high-performance.

190.    Defendants benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs have overpaid for the cars and, in some instances, been forced to pay to (unsuccessfully) repair the Defect.

191.    Plaintiffs and Class Members elected to purchase or lease the Class Vehicles based on Defendants' misrepresentations, deception, and omissions. Defendants knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class Members when they elected to purchase or lease the Class Vehicles.

192.    The Class Vehicles' Defect, and Defendants' concealment of the same, enriched Nissan beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues since 2019 and continues to do so today, not the least through the sale of replacement engines for which Defendants are the sole source.

193.    Therefore, because Defendants will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class member are entitled to recover the amount by which Defendants were unjustly enriched at his or her expense.

194.    Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against Defendants in the amounts by which they have been unjustly enriched at

Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper.

**COUNT III**

**Violation of the Magnuson-Moss Warranty Act**
**(15 U.S.C. § 2301, _et seq._)**
**(On Behalf of the Class, or Alternatively, all Sub-Classes, or on Behalf of Themselves**
**Individually Against All Defendants)**

195.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 194 above as if fully set forth herein.

196.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, _et seq_. ("MMWA") by virtue of 28 U.S.C. §1332(a)-(d).

197.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

198.    Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its written warranties.

199.    Defendants are "suppliers" and "warrantors" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

200.    15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

201.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, NNA provided Plaintiffs and Class Members with a warranty covering defects in materials and workmanship of the Class Vehicles for five years or 60,000 miles, for Nissan brand vehicles, or six years or 70,000 miles, for Infiniti brand vehicles, both of which are covered under 15 U.S.C. §2301(6).

202.    Defendants breached their warranties, as described in more detail above, and is therefore liable to Plaintiffs and Class Members pursuant to 15 U.S.C. §2310(d)(1).  Without limitation, the Class Vehicle's Engines suffered from a design, material and/or manufacturing

defect that reduced the Class Vehicles' value and causes variable compression system Engine components, as well as the Engine itself, to fail well before the end of the expected useful life of those components. Through its practice of covering the cost of having the Class Vehicles' Engines and/or components replaced when the Class Vehicle is still under warranty, Defendants tacitly admitted that the Class Vehicles suffer from a Defect of its own making, but Defendants' inability to provides repairs that actually resolve the Defect and its refusal to acknowledge the Defect in order to inform current and future purchasers and lessors of Class Vehicles is woefully insufficient.

203.    In its capacity as a warrantor, NNA had knowledge of the inherent defect in the Class Vehicles. Any effort by NNA to limit any aspect of its warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

204.    Any limitations NNA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between NNA and Plaintiffs and Class Members, as, at the time of purchase and lease, Plaintiffs and Class Members had no other options for purchasing warranty coverage other than directly from NNA. This is particularly true because third-parties who offer extended warranty coverage specifically disclaim coverage for defects caused by the manufacturer.

205.    Any limitations Defendants might seek to impose on any warranties are substantively unconscionable. Defendants knew that the Class Vehicles were defective and would continue to pose infrastructure and quality concerns after the warranties purportedly expired. Defendants failed to disclose the Defect and the problems it causes to Plaintiffs and Class Members. Thus, any Defendant's enforcement of the durational limitations on written warranties is harsh and shocks the conscience.

206.    Defendants' breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

207.    Because Plaintiffs and Class Members purchased their vehicles from an authorized Nissan or Infiniti dealership, they are in privity with NNA. Plaintiffs and the members of the Class

have had sufficient direct dealings with NNA and its agents for the purpose of establishing a warranty relationship (dealerships and customer support personnel) to establish privity of contract between NNA, on one hand, and Plaintiffs and the members of the Class, on the other hand. Furthermore, Nissan provided warranties directly to Plaintiffs and the members of the Class and Plaintiffs and the members of the Class are the intended beneficiaries of NNA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

208.    Nonetheless, privity is not required here because Plaintiffs and the members of the Class are the intended third-party beneficiaries of contracts between NNA and its dealerships. These contracts give the dealerships the right to sell Nissan and Infiniti brand vehicles, as well as service and perform warranty repairs on NNA's behalf.  Plaintiffs and the members of the Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products NNA distributes to its authorized dealerships.  Plaintiffs and the members of the Class also have the right to receive service and warranty work at dealerships located more conveniently to them than NNA's headquarters.

209.    Defendants breached these warranties, as described in more detail above. Without limitation, the Class Vehicles suffer from a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are defectively designed and/or manufactured with defective materials and/or with poor workmanship. Contrary to Nissan's representations about its vehicles, the Class Vehicles are uniformly defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

210.    Affording Defendants a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Defendants have long been on notice of the claims of Plaintiffs and Class Members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the Engine Defect.

211.    At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

212.    Pursuant to 15 U.S.C. §2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Fed. R. Civ. P. 23. Notwithstanding the foregoing, Plaintiffs provided notice to Defendants of their intent to pursue claims under the MMWA via letter dated October 17, 2024.

213.    Plaintiffs and Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and Class Members have not reaccepted their Class Vehicles by retaining them.

214.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. §2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs in connection with the commencement and prosecution of this action.

**Claims on Behalf of the Florida Sub-Class**

<u>COUNT IV</u>
**Breach of Express Warranty**
**F.S.A. §§ 672.313 and 680.21**
**(On behalf of the Class, or Alternatively, all Sub-Classes Against NNA)**

215.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

216.    Plaintiff Dennis Becker ("Florida Plaintiffs") bring this count on behalf of themselves and the Florida Sub-Class against Defendant.

217.    NNA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

218.    With respect to leases, NNA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

219.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

220.    The engines in the Class Vehicles are covered by the express warranty issued by NNA.

221.    NNA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, NNA's express warranty is an express warranty under Florida state law.

222.    Defendant's express warranty covers any repairs needed to correct defects in material or workmanship" for the Engine, Transmission and Transaxle, Drivetrain, and Restraint System. The components covered for the Engine include "cylinder heads and block and all internal parts, rocker covers and oil pan, valve train and front cover, timing change and tensioner, oil pump, water pump, and fuel pump, fuel injectors, intake and exhaust manifolds, flywheel, seals and gaskets." The duration of this warranty is 5 years or 60,000 miles, whichever comes first, for Nissan-brand vehicles and 6 years or 72,000 miles, whichever comes first, for Infiniti-brand vehicles.

223.    Defendant's powertrain and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Florida Plaintiffs and members of the Florida Sub-Class purchased or leased the Class Vehicles with the defective engines.

224.    Florida Plaintiffs and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Florida Plaintiffs and members of the Florida Sub-Class that the Class Vehicles were equipped with defective engines.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Engine Defect.

225.    NNA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

226.    Privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between NNA and its distributors and dealers, and specifically, of NNA's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

227.    Any attempt by NNA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because NNA knowingly sold or leased defective products without informing consumers about the Engine Defect.  The time limits are unconscionable and inadequate to protect Florida Plaintiffs and the members of the Florida Sub-Class.  Among other things, Florida Plaintiffs and members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by NNA and unreasonable favored NNA. A gross disparity in bargaining power and

knowledge of the extent, severity, and safety risk of the Engine Defect existed between NNAand members of the Florida Sub-Class.

228.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiffs and the members of the Florida Sub-Class whole, because NNA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

229.    Florida Plaintiffs were not required to notify NNA of the breach because affording NNA a reasonable opportunity to cure its breach of written warranty would have been futile. NNA was also on notice of the Engine Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

230.    Nonetheless, Florida Plaintiffs and members of the Florida Sub-Class provided notice to NNA of the breach of express warranties when they took their vehicles to an NNA - authorized provider of warranty repairs and when they provided written notice to NNA dated October 17, 2024.

231.    As a result of NNA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

232.    As a direct and proximate result of Defendant's breach of express warranties, Florida Plaintiffs and members of the Florida Sub-Class have been damaged in an amount to be determined at trial.

233.    As a result of NNA's breach of the express warranty, Florida Plaintiffs and Florida Sub-Class Members are entitled to legal and equitable relief against NNA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

<u>COUNT V</u>
**Breach of The Implied Warranty of Merchantability**
**F.S.A. §§ 672.314 and 680.212**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

234.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 233 above as if fully set forth herein.

235.    Florida Plaintiffs bring this count on behalf of themselves and the Florida Sub-Class against Defendants.

236.    Defendants are and were at all relevant times each a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

237.    With respect to leases, Defendants are and were at all relevant times each a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

238.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

239.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

240.    Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Florida Plaintiffs and members of the Florida Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiffs and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

241.    Defendants provided Florida Plaintiffs and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for

their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

242.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

243.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Defendants knew of this defect at the time these sale or lease transactions occurred.

244.    As a result of Defendants' breach of the applicable implied warranties, Florida Plaintiffs and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Florida Plaintiffs and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

245.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

246.    Florida Plaintiffs and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

247.    Privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between NNA and its distributors and dealers, and specifically, of NNA's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not

intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

248.    Florida Plaintiffs and members of the Florida Sub-Class were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure its breach of warranty would have been futile. Defendants were also on notice of the Engine Defect from the complaints and service requests it received from Florida Plaintiffs and the Class Members and through other internal sources.

249.    Nonetheless, Florida Plaintiffs and members of the Florida Sub-Class provided notice to Defendants of the breach of implied warranties when they took their vehicles to an NNA-authorized provider of warranty repairs.  Florida Plaintiffs further provided notice of their implied warranty claims via letter to Defendants dated October 17, 2024.

250.    As a direct and proximate cause of Nissan's breach, Florida Plaintiffs and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

251.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Florida Plaintiffs and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

### COUNT VI
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**F.S.A. §§ 501.201-.213**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

252.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 251 above as if fully set forth herein.

253.    Florida Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Florida Sub-Class.

254.    Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes ("FDUTPA").

255.    At all relevant times, Florida Plaintiffs and members of the Florida Sub-Class were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

256.    Defendants' conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

257.    FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" at set forth in the statute. Fla. Stat. § 501.204(1). Breach of express and implied warranties constitutes an unfair or deceptive act or practice under FDUTPA. Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

258.    Defendants participated in unfair or deceptive trade practices that violated the FDUTPA. As described below and alleged throughout the Complaint, by failing to disclose the Engine Defect, by concealing the Engine Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Engine Defect in the course of its business.

259.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

260.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

261.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

262.    Defendants knew or should have known that its conduct violated the FDUTPA.

263.    Defendant was under a duty to Florida Plaintiffs and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)    Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles;

(c)    Defendants actively concealed the defective nature of the Class Vehicles from Florida Plaintiffs and the Florida Sub-Class Members at the time of sale and thereafter; and

(d)    Defendants concealed that they were unable to live up to their express and implied warranties and were incapable of providing a permanent repair for the Engine Defect.

264.    By failing to disclose the Engine Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

265.    The facts concealed or not disclosed by Defendants to Florida Plaintiffs and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's engine can cause stalling, losing power while driving, and stop working entirely, is a material safety concern. Had Florida Plaintiffs and the Florida Sub-Class Members known that the Class Vehicles suffered from the Engine Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

266.    Florida Plaintiffs and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Engine Defect. That is the reasonable and objective consumer expectation for vehicles.

267.    As a result of Defendants' misconduct, Florida Plaintiffs and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

268.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Florida Plaintiffs and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

269.    Defendants' violations present a continuing risk to Florida Plaintiffs and the Florida Sub-Class Members as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

270.    Florida Plaintiffs and the Florida Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUTPA. Because Defendants acted with willful and conscious disregard of the rights and safety of others, Defendants' conduct constitutes malice, oppression, and fraud warranting punitive damages.

**Claims on Behalf of the Missouri Sub-Class**

**COUNT VII**
**Breach of Express Warranty**
**Mo. Rev. Stat. §§ 400.2-313 and 400.2A-210**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against NNA)**

271.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 270 above as if fully set forth herein.

272.    Plaintiff Gabrielle Wrigley ("Missouri Plaintiff") brings this count on behalf of herself and the Missouri Sub-Class against Defendant.

273.    NNA is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

274.    With respect to leases, NNA is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

275.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

276.    The Engines were manufactured and/or installed in the Class Vehicles by Defendant and/or are covered by the express warranty.

277.    NNA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, NNA's express warranty is an express warranty under Missouri state law.

278.    Defendant's express warranty covers any repairs needed to correct defects in material or workmanship" for the Engine, Transmission and Transaxle, Drivetrain, and Restraint System.  The components covered for the Engine include "cylinder heads and block and all internal parts, rocker covers and oil pan, valve train and front cover, timing change and tensioner, oil pump, water pump, and fuel pump, fuel injectors, intake and exhaust manifolds, flywheel, seals and gaskets." The duration of this warranty is 5 years or 60,000 miles, whichever comes first, for Nissan-brand vehicles and 6 years or 72,000 miles, whichever comes first, for Infiniti-brand vehicles.

279.    Defendant's warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Missouri Plaintiff and members of the Missouri Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

280.    Missouri Plaintiff and members of the Missouri Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Missouri Plaintiff and members of the Missouri Sub-Class that the Class Vehicles were equipped with defective engines. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Engine Defect.

281.    NNA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part

supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

282.    Privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between NNA and its distributors and dealers, and specifically, of NNA's express warranties, including the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

283.    Any attempt by NNA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because NNA knowingly sold or leased defective products without informing consumers about the Engine Defect. The time limits are unconscionable and inadequate to protect Missouri Plaintiff and the members of the Missouri Sub-Class. Among other things, Missouri Plaintiff and members of the Missouri Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by NNA and unreasonably favored NNA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Engine Defect existed between NNA and members of the Missouri Sub-Class.

284.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Missouri Plaintiff and the members of the Missouri Sub-Class whole, because NNA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

285.    Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify NNA of the breach because affording NNA a reasonable opportunity to cure its breach of written warranty would have been futile. NNA was also on notice of the Engine Defect from the

complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

286.    Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to NNA of the breach of express warranties when they took their vehicles to NNA - authorized providers of warranty repairs. Missouri Plaintiff also provided notice to NNA of its breach of express warranty by letter dated October 17, 2024.

287.    As a result of NNA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

288.    As a direct and proximate result of Defendant's breach of express warranties, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be determined at trial.

289.    As a result of NNA's breach of the express warranty, Missouri Plaintiff and Missouri Sub-Class Members are entitled to legal and equitable relief against NNA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

<u>COUNT VIII</u>
**Breach of The Implied Warranty of Merchantability**
**Mo. Rev. Stat.. §§ 400.2-314 and 400.2A-212**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

290.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 289 above as if fully set forth herein.

291.    Missouri Plaintiff brings this count on behalf of herself and the Missouri Sub-Class against Defendants.

292.    Defendants are and were at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

293.    With respect to leases, Defendants are and were at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

294.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

295.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and § 400.2A-212.

296.    Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Missouri Plaintiff and members of the Missouri Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiff and members of the Missouri Sub-Class, with no modification to the defective Class Vehicles.

297.    Defendants provided Missouri Plaintiff and members of the Missouri Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

298.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

299.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Defendants knew of this defect at the time these sale or lease transactions occurred.

300.    As a result of Defendants breach of the applicable implied warranties, Missouri Plaintiff and members of the Missouri Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Missouri Plaintiff and members of the Missouri Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

301.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

302.    Missouri Plaintiff and members of the Missouri Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

303.    Privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between NNA and its distributors and dealers, and specifically, of NNA's express warranties, including the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

304.    Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of warranty would have been futile. Defendants were also on notice of the Engine Defect from the complaints and service requests it received from Missouri Plaintiff and the Class Members and through other internal sources.

305.    Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to Defendants of the breach of implied warranties when they took their vehicles to Nissan-authorized provider of warranty repairs. Missouri Plaintiff also provided notice to Nissan of its breach of express warranty by letter dated October 17, 2024.

81

306.    As a direct and proximate cause of Nissan's breach, Missouri Plaintiff and members of the Missouri Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiff and members of the Missouri Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

307.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be proven at trial.

### COUNT IX
**Violations of the Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. § 407.010, *et seq.***
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

308.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 307 above as if fully set forth herein.

309.    Missouri Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Missouri Sub-Class.

310.    Defendants, Missouri Plaintiff and members of the Missouri Sub-Class are "persons" within the meaning of the Missouri Merchandising Practices Act ("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

311.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

312.    The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Missouri MPA.

313.    Defendants participated in unfair or deceptive trade practices that violated the Missouri MPA. As described below and alleged throughout the Complaint, by failing to disclose the Engine Defect, by concealing the Engine Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Engine Defect in the course of its business.

314.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

315.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Nissan's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

316.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

317.    Defendants knew or should have known that its conduct violated the Missouri MPA.

318.    Defendants were under a duty to Missouri Plaintiff and the Missouri Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)    Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles;

83

(c)    Defendants actively concealed the defective nature of the Class Vehicles from Missouri Plaintiff and the Missouri Sub-Class Members at the time of sale and thereafter; and

(d)    Defendants concealed that they were unable to live up to their express and implied warranties and were incapable of providing a permanent repair for the Engine Defect.

319.    By failing to disclose the Engine Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

320.    The facts concealed or not disclosed by Defendants to Missouri Plaintiff and the Missouri Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a engine is defective, causing stalling, losing power while driving, and for it to stop working entirely, is a material safety concern. Had Missouri Plaintiff and the Missouri Sub-Class Members known that the Class Vehicles suffered from the Engine Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

321.    Missouri Plaintiff and the Missouri Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Engine Defect. That is the reasonable and objective consumer expectation for vehicles.

322.    As a result of Defendants' misconduct, Missouri Plaintiff and the Missouri Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

323.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Sub-Class Members have suffered and will continue to suffer actual damages.

324.    Defendants' violations present a continuing risk to Missouri Plaintiff and the Missouri Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

325.    Missouri Plaintiff provided notice of her claims, including a written demand for relief, by letter dated October 17, 2024.

326.    Defendants are liable to Missouri Plaintiff and Missouri Sub-Class Members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

**Claims on Behalf of the New York Sub-Class**

<u>**COUNT X**</u>
**Breach of Express Warranty**
**N.Y. U.C.C. §§ 2-314 and 2A-210**
**(On behalf of the Class, or Alternatively, all Sub-Classes Against NNA)**

327.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 326 above as if fully set forth herein.

328.    Plaintiffs Jean Coney ("New York Plaintiffs") bring this count on behalf of themselves and the New York Sub-Class against Defendant.

329.    NNA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

330.    With respect to leases, NNA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

331.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

332.    The engines were manufactured and/or installed in the Class Vehicles by NNA and/pr are covered by the express warranty.

333.    NNA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, NNA's express warranty is an express warranty under New York state law.

334.    Defendant's express warranty covers any repairs needed to correct defects in material or workmanship" for the Engine, Transmission and Transaxle, Drivetrain, and Restraint System.  The components covered for the Engine include "cylinder heads and block and all internal parts, rocker covers and oil pan, valve train and front cover, timing change and tensioner, oil pump, water pump, and fuel pump, fuel injectors, intake and exhaust manifolds, flywheel, seals and gaskets." The duration of this warranty is 5 years or 60,000 miles, whichever comes first, for Nissan-brand vehicles and 6 years or 72,000 miles, whichever comes first, for Infiniti-brand vehicles.

335.    Defendant's warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New York Plaintiffs and members of the New York Sub-Class purchased or leased the Class Vehicles with the defective engine.

336.    New York Plaintiffs and members of the New York Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform New York Plaintiffs and members of the New York Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Engine Defect.

337.    NNA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

338.    Privity is not required here because New York Plaintiffs and members of the New York Sub-Class are intended third-party beneficiaries of contracts between NNA and its distributors and dealers, and specifically, of NNA's express warranties, including the Powertrain

Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

339.    Any attempt by NNA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because NNA knowingly sold or leased defective products without informing consumers about the Engine Defect. The time limits are unconscionable and inadequate to protect New York Plaintiffs and the members of the New York Sub-Class. Among other things, New York Plaintiffs and members of the New York Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by NNA and unreasonable favored NNA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Engine Defect existed between NNA and members of the New York Sub-Class.

340.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New York Plaintiffs and the members of the New York Sub-Class whole, because NNA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

341.    New York Plaintiffs were not required to notify NNA of the breach because affording NNA a reasonable opportunity to cure its breach of written warranty would have been futile. NNA was also on notice of the Engine Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

342.    Nonetheless, New York Plaintiffs and members of the New York Sub-Class provided notice to NNA of the breach of express warranties when they took their vehicles to NNA-

authorized providers of warranty repairs. New York Plaintiffs also provided notice to NNA of its breach of express warranty by letter dated October 17, 2024.

343.     As a result of NNA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

344.     As a direct and proximate result of Defendant's breach of express warranties, New York Plaintiffs and members of the New York Sub-Class have been damaged in an amount to be determined at trial.

345.     As a result of NNA's breach of the express warranty, New York Plaintiffs and New York Sub-Class Members are entitled to legal and equitable relief against NNA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**<u>COUNT XI</u>**
**Breach of The Implied Warranty of Merchantability**
**N.Y. U.C.C. §§ 2-314 and 2A-212**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

346.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 345 above as if fully set forth herein.

347.     New York Plaintiffs brings this count on behalf of themselves and the New York Sub-Class against Defendants.

348.     Defendants are and were at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

349.     With respect to leases, Defendants are and were at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

350.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

351.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

352.    Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New York Plaintiffs and members of the New York Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New York Plaintiffs and members of the New York Sub-Class, with no modification to the defective Class Vehicles.

353.    Defendants provided New York Plaintiffs and members of the New York Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

354.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

355.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Nissan knew of this defect at the time these sale or lease transactions occurred.

356.    As a result of Nissan's breach of the applicable implied warranties, New York Plaintiffs and members of the New York Sub-Class suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, New York Plaintiffs and members of the New York Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

357.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

358.    New York Plaintiffs and members of the New York Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

359.    Privity is not required here because New York Plaintiffs and members of the New York Sub-Class are intended third-party beneficiaries of contracts between NNA and its distributors and dealers, and specifically, of NNA's express warranties, including the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

360.    New York Plaintiffs and members of the New York Sub-Class were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure its breach of warranty would have been futile. Defendants were also on notice of the Engine Defect from the complaints and service requests it received from New York Plaintiff and the Class Members and through other internal sources.

361.    Nonetheless, New York Plaintiffs and members of the New York Sub-Class provided notice to Defendants of the breach of express warranties when they took their vehicles to NNA-authorized provider of warranty repairs.  New York Plaintiffs also provided notice to Nissan of its breach of implied warranty by letters dated October 17, 2024.

362.    As a direct and proximate cause of Defendants' breach, New York Plaintiffs and members of the New York Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New York Plaintiffs and members of the New York Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

363.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, New York Plaintiffs and members of the New York Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XII**
**Violations of the New York General Business Law**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the Class, or Alternatively, all Sub-Classes Against All Defendants)**

364.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 363 above as if fully set forth herein.

365.    New York Plaintiffs brings this cause of action on behalf of themselves and on behalf of the members of the New York Sub-Class.

366.    New York Plaintiffs and members of the New York Sub-Class are "persons" as defined by the New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

367.    Defendants are a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.  New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New York GBL.

368.    Defendants participated in unfair or deceptive trade practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the

Engine Defect, by concealing the Engine Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting themselves as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Engine Defect in the course of its business.

369.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

370.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Nissan's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

371.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

372.    Defendants knew or should have known that its conduct violated the New York GBL.

373.    Defendants were under a duty to New York Plaintiffs and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)    Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles;

(c)    Defendants actively concealed the defective nature of the Class Vehicles from New York Plaintiffs and the New York Sub-Class Members at the time of sale and thereafter; and

(d)    Defendants concealed that they were unable to live up to their express and implied warranties and were incapable of providing a permanent repair for the Engine Defect.

374.    By failing to disclose the Engine Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

375.    The facts concealed or not disclosed by Defendants to New York Plaintiffs and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's engine is defective, causing stalling, losing power while driving and for the engine to stop working entirely, is a material safety concern. Had New York Plaintiffs and the New York Sub-Class Members known that the Class Vehicles suffered from the Engine Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

376.    New York Plaintiffs and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Engine Defect. That is the reasonable and objective consumer expectation for vehicles.

377.    As a result of Defendants' misconduct, New York Plaintiffs and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

378.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, New York Plaintiffs and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

379.    Defendants' violations present a continuing risk to New York Plaintiffs and the New York Sub-Class Members as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

380.    New York Plaintiffs provided notice of their claims by letter dated October 17, 2024.

381.    Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiffs and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendants' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining Nissan's deceptive conduct, and any other just and proper relief available under the New York GBL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs, the Class and all Sub-Classes, and award the following relief:

A.    A declaration that Defendants are financially responsible for notifying all Class Members of the Defect;

B.    An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to repair and eliminate the Defect from every Class Vehicle; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

C.    Damages and restitution in an amount to be proven at trial;

D.    An order certifying the proposed Class and Sub-Classes, designating Plaintiffs named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

E.  A declaration that Defendants are financially responsible for notifying all Class

    Members about the defective nature of the Class Vehicles;

F.  Any and all remedies provided pursuant to the express and implied warranty laws,

    common law fraud by concealment laws, and consumer protection statutes alleged

    herein;

G.  An award to Plaintiffs and the Class and Sub-Classes of compensatory, exemplary,

    and statutory damages as applicable, including interest, in an amount to be proven at

    trial;

H.  A declaration that Defendants must disgorge, for the benefit of the Class and Sub-

    Classes, all or part of the ill-gotten profits it received from the sale or lease of Class

    Vehicles, and/or make full restitution to Plaintiffs and Class Members;

I.  An award of attorneys' fees and costs, as allowed by law;

J.  An award of pre-judgment and post-judgment interest, as provided by law;

K.  Leave to amend the Complaint to conform to the evidence produced at trial; and

L.  Such other relief as may be appropriate under the circumstances.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Respectfully submitted,

/s/  *Jason Z. Miller*
Kelly A. Green (DE Bar No. 4095)
Jason Z. Miller (DE Bar No. 6310)
**SMITH, KATZENSTEIN & JENKINS, LLP**
1000 N. West Street, Suite 1501
Wilmington, DE 19801
Tel.: (302) 504-1656
Fax: (302) 652-8405
kag@skjlaw.com

95

jzm@skjlaw.com

Abigail Gertner (*pro hac vice* to be filed)
Cody R. Padgett (*pro hac vice* to be filed)
Nathan N. Kiyam (*pro hac vice* to be filed)
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396
Abigail.Gertner@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Nate.Kiyam@capstonelawyers.com

Adam A. Edwards (*pro hac vice* to be filed)
Will A. Ladnier (*pro hac vice* to be filed)
Virginia Ann Whitener (*pro hac vice* to be filed)
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: 865-247-0080
Fax: 856-522-0049
aedwards@milberg.com
wladnier@milberg.com
gwhitener@milberg.com